# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; DISTRICT OF COLUMBIA; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in her official capacity as Attorney General of the United States; OFFICE OF JUSTICE PROGRAMS; MAUREEN HENNEBERG, in her official capacity as Acting Assistant Attorney General for the Office of Justice Programs; OFFICE FOR VICTIMS OF CRIME; KATHERINE DARKE SCHMITT, in her official capacity as Acting Director of the Office for Victims of Crime; BUREAU OF JUSTICE ASSISTANCE; TAMMIE GREGG, in her official capacity as Acting Director of the Bureau of Justice Assistance; OFFICE ON VIOLENCE AGAINST WOMEN; GINGER BARAN LYONS, in her official capacity as Deputy Director for Grants Development and Management of the Office on Violence Against Women, <br><br> *Defendants*. | No. 1:25-cv-_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Over the last month-and-a-half, Defendants have notified Plaintiff States of a new, post hoc condition that precludes Plaintiff States from using some victim services and criminal justice funds for legal services to immigrants. Defendants have offered no explanation for these new conditions, much less any explanation of how these new conditions apply in practice. Defendants' actions violate the Spending Clause, are arbitrary and capricious, and are contrary to law.

2.      The funds at issue are awarded by the Department of Justice ("DOJ")'s Office of Justice Programs ("OJP"), through its Office for Victims of Crime ("OVC") and Bureau of Justice Assistance ("BJA"), and by DOJ's Office on Violence against Women ("OVW"), which oversee various federal grants programs that provide States with resources needed to develop a full ecosystem of programs and services that support access to justice. OJP's mission includes providing "federal leadership, funding, and other critical resources" to States and other beneficiaries, in advancement of its greater goal of effecting justice and safety for all. OWV's mission is to "provide federal leadership in developing the nation's capacity to reduce violence against women and administer justice for and strengthen services to victims of domestic violence, dating violence, sexual assault, and stalking."

3.      Grantmaking is a key way that DOJ offices, including OJP and OVW, advance their missions. For example, OJP administers grants authorized by the Victims of Crime Act ("VOCA"), which was passed over forty years ago to ensure the cooperation of victims and witnesses in reporting and testifying about crimes through the provision of services and support. VOCA funds both emergency legal assistance (such as restraining and protective orders), and other legal assistance associated with the direct result of victimization. OVW administers programs

authorized by the Violence Against Women Act ("VAWA"), which provide resources strengthening victim services in cases of crimes against women and others. The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, administered by BJA, provides funds to support an array of programs designed to improve the criminal justice system, including to ensure adequate staffing at public defenders' offices, particularly in rural areas with insufficient labor pools.

4.      On August 18 of this year, Plaintiff States received surprise notices of a new condition from OJP that would upend their practices, as well of those of their subgrantees, with respect to the VOCA programs, the Byrne JAG program, and potentially a range of other OJP grant programs. The new condition purported to restrict the use of grant funds to provide some legal services for certain immigrants. Less than a month later, Defendants changed course, issuing a superseding policy on September 15, and incorporating that revised condition into the DOJ Grant Financial Guide (the "DOJ Guide"), a document that provides guidance for a range of DOJ's grantees and subgrantees under OJP, OWV, and the Office of Community-Oriented Policing Services ("COPS"). In adding the condition to the DOJ Guide, Defendants expanded its applicability to additional grant programs beyond the two that had received the emailed notices— including, at least, the VAWA programs administered by OVW.

5.      The condition as published in the DOJ Guide states that the "costs of providing legal services (that is, professional services of the kind lawfully provided only by individuals licensed to practice law) to any removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States are disallowed and may not be charged against the award" (the "Legal Services Condition" or the "Condition"). The Condition also states that costs for the following legal services are *not* disallowed:

- Orders of protection, "including associated or related orders (e.g., custody orders), arising from the victimization;"

1

- Services associated with 18 U.S.C. ch. 77, relating to "peonage, slavery, and trafficking in persons;"
- Services to obtain T-visas, U-visas, or "'continued presence' immigration status (see, e.g., 8 U.S.C. § 1101(a)(15)(T) & (U); 22 U.S.C. § 7105(c)(3)(A));" and,
- Services for which "disallowance would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award."

6.      Grantees that serve as passthroughs, such as Plaintiff States' agencies tasked with subgranting Defendants' grants, appear to be required to monitor all subgrantees for compliance with the Financial Guide's terms and conditions, including the Legal Services Condition. This monitoring likely includes conducting audits for certain subrecipients, as well as ensuring corrective actions are taken when needed, and other related measures. Defendants and their Financial Guide have not made clear how Plaintiff States must determine subgrantees' compliance with the Legal Services Condition.

7.      This Condition violates the U.S. Constitution's Spending Clause in two ways. First, it is unconstitutionally retroactive because it applies to grants awarded before the Condition was issued, including "open" VOCA and Byrne JAG grants. Accordingly, Plaintiff States had no opportunity to consider this Condition before accepting their awards. Second, for all grants, it is ambiguous as to (i) which particular legal services are restricted, (ii) which subset of immigrants are restricted from legal services, and (iii) how States are meant to determine which subset of immigrants are to be restricted from accessing legal services. As a result, Plaintiff States and their subgrantees are left to guess which services are covered for whom, and to guess which new processes may be required to comply with the Condition. If the Condition is construed to require verification of the immigration statuses of all clients before legal services can be offered, it is equally ambiguous as to how Plaintiff States would effectively enact compliance with this Condition and monitor subgrantee compliance as well.

8.     The Condition also violates the Administrative Procedure Act's ("APA") prohibition on arbitrary and capricious agency action. Defendants have demonstrated no awareness of the change in position that the Legal Services Condition creates, and have offered no explanation for the Condition, let alone a reasonable and well-reasoned one. Defendants, in including the Condition in the DOJ Guide, appear to have indicated an intent to apply it as an across-the-board condition, with no consideration of the various statutory schemes and goals underlying the impacted grant programs. Further, Defendants have failed to consider important aspects of the problem they are ostensibly seeking to address, and have likewise failed to consider the significant harm to Plaintiff States administering these programs, and through subgrantees, to individuals needing legal services. They have, moreover, demonstrated no consideration, or even understanding, of the reliance interests of the Plaintiff States in ensuring that services are available to individuals in accordance with the law, or the burden that the Condition will place on Plaintiff States. The Condition is also arbitrary and capricious because it fails to explain how Plaintiff States are to interpret multiple ambiguities within the Condition itself.

9.     Finally, with respect to VAWA and VOCA Victim Assistance, the Legal Services Condition is contrary to law because it is in direct conflict with governing regulations providing that eligibility for services "is not dependent on the victim's immigration status." 28 C.F.R. § 90.4(c) (for VAWA); 28 C.F.R. §§ 94.103, 94.116 (for VOCA Victim Assistance).

### JURISDICTION AND VENUE

10.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 702, 705, and 706.

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in her official capacity. The State of Rhode Island is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

**A.     Plaintiffs**

12.     Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

13.     Plaintiff the State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

14.     Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

15.     Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter F. Neronha, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

16.     Plaintiff the State of Arizona is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Attorney General Kristin K. Mayes. See Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

4

17.     Plaintiff the State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

18.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

19.     Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

20.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

21.     Plaintiff the state of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

22.     Plaintiff the State of Maryland is a sovereign state in the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

23.     Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

24.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

25.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

26.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

27.     Plaintiff the State of New Jersey, represented by and through its Attorney General, Mathew J. Platkin, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. The Attorney General is also head of the New Jersey Department of Law and Public Safety, which is the agency

responsible for applying for, obtaining, and disbursing funds pursuant to the federal grant programs that are subject of this litigation. *See* N.J. Stat. Ann. § 52:17B-2.

28.    Plaintiff State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

29.    State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

30.    Plaintiff the State of Vermont, represented by its Attorney General, Charity R. Clark, is a sovereign State in the United States of America. Attorney General Clark is authorized to act on behalf of the State in this matter.

31.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State in the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern under Wash. Rev. Code ch. 43.10.

32.    Plaintiff the State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

**B.    Defendants**

33.    Defendant United States Department of Justice is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action.

34.    Defendant Pamela J. Bondi is the United States Attorney General and the federal official in charge of DOJ. The Attorney General is sued in her official capacity.

35.    Defendant Office for Justice Programs is the largest grantmaking component of DOJ. In addition to overseeing the work of other, subsidiary grantmaking offices within the DOJ, OJP oversees various Program Offices that administer grant programs, including the Office for Victims of Crime.

36.    Defendant Maureen Henneberg ("Acting AAG") is the Deputy Assistant Attorney General for Operations and Management within DOJ currently in charge in an acting capacity of OJP. The Acting AAG is sued in her official capacity.

37.    Defendant Office for Victims of Crime is a Program Office within OJP, and is authorized to administer the Crime Victims Fund and associated grant programs. OVC oversees administration of the formula and discretionary grants administered pursuant to VOCA.

38.    Defendant Katherine Darke Schmitt ("Acting OVC Director") is the Acting Director within DOJ and OJP in charge of OVC. The Acting OVC Director is sued in her official capacity.

39.    Defendant Bureau of Justice Assistance is a Program Office within OJP, and is authorized to administer various formula grant programs, including the Byrne JAG program, 34 U.S.C. § 10151-58, Pub. L. No. 90-351.

40.    Defendant Tammie Gregg ("Acting BJA Director") is the Acting Director within DOJ and OJP for the BJA. She is sued in her official capacity.

41.    Defendant Office on Violence Against Women is a DOJ component with sole authority over all activities authorized or undertaken under the Violence Against Women Act and

reauthorizations, including with respect to grants and cooperative agreements awarded by the office.

42.     Defendant Ginger Baran Lyons ("Acting OVW Director") is Deputy Director for Grants Development and Management and serves as the Supervisory Official for OVW. She is sued in her official capacity.

## ALLEGATIONS

I.     **DOJ provides States with critical grants to aid victims and witnesses, and to improve the criminal justice system.**

### A.  The VOCA programs

43.     VOCA was passed in 1984 to provide resources and programming to meet the basic needs and to affirm the dignity of victims and witnesses of crime, and their impacted families. VOCA created the Crime Victims Fund (the "Fund"), to "provide limited federal funding to the States, with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime." S. Rep. No. 98-497, at 1, 3 (1984). The Fund is funded and replenished through various criminal fines and penalties, including those collected pursuant to deferred prosecution agreements, and other similar sources. 34 U.S.C. § 20101(b). The Fund in turn is used to support two formula grant programs: Victim Assistance and Victim Compensation.

44.     The VOCA programs are both administered by OJP, the largest grantmaking component within the DOJ, through OVC. OJP provides funding and other resources to States and other eligible entities. Its mandate is to "advance[e] work that furthers DOJ's mission to uphold the rule of law, to keep our country safe, and protect civil rights." *About Us*, OJP, https://www.ojp.gov/about (last visited September 30, 2025). OJP's budget for FY2024 was in excess of five billion dollars.

9

*VOCA Victim Assistance Formula Grants*

45.    The Victim Assistance Formula Grants, which constitute the majority of VOCA funding that goes to States, are formula grants used by States to support subgrantees offering a range of services and offer funding directly to victims and witnesses. 34 U.S.C. § 20103. Subgrantee organizations, which could be other public agencies, non-profits, or community-based organizations, provide a broad range of direct services under this grant.

46.    VOCA regulations establish the types of direct services provided by subgrantees that are allowable under the Victim Assistance grant. These services include, among others, mental health services, victim advocacy, accompaniment to court proceedings, relocation services, forensic medical examinations, and direct legal assistance. 28 C.F.R. § 94.119. VOCA regulations provide that "emergency legal assistance," including "obtaining emergency custody orders and visitation rights," are among the types of allowable costs under the Victim Assistance program. 28 C.F.R. § 94.119(a)(10). Under this provision, a subgrantee organization, for example, may use VOCA Victim Assistance funds to assist a victim in a legal action seeking an order of protection against their abuser or a legal proceeding in which a victim is seeking sole custody of their child on an emergency basis in family court immediately after a domestic violence situation.

47.    VOCA and its implementing regulations confirm that a wide range of legal services and assistance are available for victims. The VOCA Victim Assistance regulations state that other, non-emergency legal assistances are also allowable costs. 28 C.F.R. § 94.119(f). Additionally, in a final rule implementing the VOCA Victim Assistance formula grant program, OVC remarked that "States retain broad discretion to set limits on the type and scope of legal services that it allows its sub-recipients to provide with VOCA funding." Victims of Crime Victim Assistance Program, 81 Fed. Reg. 44515-01, 44524 (Jun. 8, 2016) (codified at 28 C.F.R. §§ 94.101-944.122) (the "Final Rule"). This discretion reflects an understanding that "the available resources [for victims and

witnesses] in each State differ," and therefore States are best positioned to make determinations about how to allocate available VOCA Victim Assistance resources within a given state. *Id*.

48.    The Victim Assistance regulations specifically allow legal services "that help victims assert their rights as victims in a criminal proceeding directly related to the victimization, or otherwise protect their safety, privacy, or other interests"; "motions to vacate or expunge a conviction" directly resulting from a circumstance where that victim him/herself has been victimized; or non-tort civil actions "reasonably necessary as a direct result of the victimization." 28 C.F.R. § 94.119(f). Under this provision, a subgrantee organization may provide a victim with, for example, civil legal assistance in seeking a marital dissolution or child support, defending against holdover proceedings, legal intervention with creditors, or a range of other types of legal assistance resulting directly from an individual's victimization.

49.    States, and their subgrantee organizations, rely on Victim Assistance funds to cover the costs of this important work. In Fiscal Year 2024, VOCA funds supported 547,378 instances of services to assist victims, witnesses, and families with *family law concerns alone*. Office of Justice Programs, VOCA Victim Assistance Data Dashboard (2025), https://ovc.ojp.gov/funding/performance-measures/data-analyses/voca-victim-assistance [https://perma.cc/56PQ-MM7H] (last visited September 30, 2025).

50.    The work is far-reaching. For example, in New York, in 2024, nearly 900,000 individuals received VOCA-funded assistance with various services categorized as "criminal and civil justice system assistance," which includes, among other things, a range of legal services, including representation in family law matters, assistance in development of victim impact statements, and victim advocacy generally. More individuals received direct services related to

"justice system assistance" in New York in 2024 under VOCA than for any other area of direct services.

51.    Similarly, in Fiscal Year 2024, California subgrantees used Victim Assistance funds to serve 991,505 Californians. Those funds support various victim assistance efforts through 35 programs, including subgrants to Victim Witness Assistance Centers at district attorney's offices in each of California's 58 counties, and to 98 non-government organizations throughout the state through the Domestic Violence Assistance Program. These programs provide various services categorized as "criminal and civil justice system assistance," which comprises the same range of legal services discussed above. For Fiscal Year 2024, California subgrantees used VOCA Victim Assistance funds to assist victims and families 108,970 times in various civil legal matters. These are some examples of the large number of victims and witnesses served by Plaintiff States through subgrantees using these funds.

52.    The use of VOCA funds to provide a range of legal assistance services to all victims, witnesses, and their families is not novel or marginal, and is in fact a central feature of VOCA.

### VOCA Victim Compensation Formula Grants

53.    The Victim Compensation Formula Grants are VOCA formula grants that reimburse victims and witnesses of crime, and their families, for a range of costs incurred as a result of the crime, including medical care (e.g., sexual assault kit testing), counseling, burial, and crime scene clean-up. The Victim Compensation program does not provide direct services to crime victims, but instead reimburses them for often-overlooked costs that fall to victims, witnesses, and their families as an immediate result of crime. 34 U.S.C. § 20102.

54.    The statute establishing VOCA's Victim Compensation program discusses eligibility criteria for States' compensation programs, and provides non-exclusive examples of the

kinds of costs that may be reimbursable, including, for example, "medical expenses," "mental health counseling and care," "loss of wages," and funeral expenses. 34 U.S.C. § 20102(b)(1). It also discusses various design features of the Victim Compensation program, including requirements that States' programs "promote" cooperation between victims and law enforcement, that States compensate nonresidents of the State when crimes occur within that state on an equal basis as residents, and that States compensate victims of Federal crime on the same basis as victims of state crime.

55.    The statute imposes only one restriction on victim eligibility for reimbursement of covered expenses, excluding "any person who has been convicted of an offense under Federal law with respect to any time period during which the person is delinquent in paying a fine." 34 U.S.C. § 20102(b)(8). Beyond this exclusion, the statute is silent as to eligibility criteria for victims.[1]

56.    States with Victim Compensation programs may adopt certain state-specific eligibility requirements for crime victims and witnesses seeking VOCA compensation. Plaintiff States do not have immigration-related eligibility requirements for recipients of Victim Compensation funds. *See, e.g.,* N.Y. Exec. Law § 624 (no immigration-related eligibility criteria for Victim Compensation funds); N.J. Stat. Ann. § 52:4B-10 (detailing the requirements for compensation in New Jersey).

---

[1] A separate statute, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), defines the term "federal public benefits" to exclude some nonqualified aliens from certain federally-funded services. OVC has affirmed that *neither* of VOCA's programs—Victim Assistance or Victim Compensation—are federal public benefits under PRWORA. Exhibit 1, Letter from Joye E. Frost, OVC Acting Director, to VOCA Administrators (June 28, 2010); Exhibit 2, Letter from Joye E. Frost, OVC Acting Director, to Cassie T. Jones, Ed.D, Executive Director, Alabama Crime Victims' Compensation Commission (July 2, 2010).

57.     Among Plaintiff States' Victim Compensation programs, some programs provide that Victim Compensations funds may be used to reimburse attorneys' fees. For example, under New York law, some attorneys' fees may be available to victims' attorneys for representation in successful appeals of Victim Compensation decisions. N.Y. Comp. Codes R. & Reg. tit. 9 § 525.9. Because immigration status is not a criterion for access to Victim Compensation funds in New York, these attorneys' fees may go to victims and witnesses irrespective of immigration status.

58.     Under New Jersey law, Victim Compensation funds may be used to cover attorney's fees and costs incurred in seeking compensation, as well as fees for legal assistance provided in other legal matters arising from the victimization. *See* N.J. Stat. Ann. § 52:4B-8; N.J. Admin. Code 13:75-4.10. These attorney's fees and costs are available irrespective of the victim's immigration status.

59.     Similarly, in Maryland, a victim may choose to be represented by an attorney at all stages of the claims process before the Criminal Injuries Compensation Board, a seven-member body with a full-time staff of 16 employees that receives applications for VOCA Victim Compensation funding, communicates with the victim and contacts claimants about the claims process to obtain missing information or documentation, determines whether the claim meets Maryland state statutory requirements for victim compensation awards, and awards or denied the compensation requests. Md. Code Regs. § 12.01.01.10(A). An attorney may be compensated for a total sum of attorney fees and expenses, an amount that does not exceed the total of 20 percent of the first $10,000 of an award, and 10 percent of the amount over $10,000. Md. Code Regs. § 12.01.01.10(E)(7). Under Maryland law, the availability of an award of attorneys' fees is not based on the immigration status of the claimant.

60.     These uses of VOCA Victim Compensation funds are central to VOCA's purpose, and, in Plaintiff States, are not restricted based on immigration status.

**B. The VAWA programs**

61.     OWV is the component of the DOJ which administers VAWA's grant programs, including STOP and SASP.  OVW's stated mission is to provide "federal leadership in developing the nation's capacity to reduce violence against women and administer justice for and strengthen services to victims of domestic violence, dating violence, sexual assault, and stalking." Mission, OVW, https://www.justice.gov/ovw (last visited September 30, 2025).

62.     Passed in 1994, VAWA authorizes funding for community organizations to provide advocacy and other services for survivors of domestic violence. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 40121, 108 Stat. 1796, 1913 (1994) (codified as amended at 34 U.S.C. § 10446). VAWA, which is administered by OVW, expressly contemplates funding "victim services and legal assistance programs, including sexual assault, domestic violence, dating violence, and stalking programs," 34 U.S.C. § 10441(b)(5) ("Purpose Area 5"), including legal services directed toward "populations underserved because of" among other factors, "alienage status." 34 U.S.C. § 12291 (a)(46).

63.     Similar to VOCA, the VAWA program operates in large part through grants made to states and administered by state agencies, which then make subgrants to organizations providing direct services on the ground to impacted survivors. 34 U.S.C. § 10446. The VAWA statute authorizes a broad range of programs in support of the overarching goals of the VAWA program. 34 U.S.C. §§ 10441 *et seq*. Among VAWA's main formula grants are the Services, Training, Officers, and Prosecutors Formula Grant Program ("STOP"), 34 U.S.C. §§ 10441, 10446-51, 10455, and the Sexual Assault Services Formula Grant Program ("SASP"), *id*. § 12511.

64.    The STOP program provides funds to States to support local communities in developing resources needed, including among law enforcement and prosecutors, to respond to violent crimes and to strengthen victim services. With STOP grant funds, for example, California has been able to provide legal services to victims related to their assertion of employment rights, seeking debt relief, and addressing identity theft. New York has been able to provide legal services and advocacy related to obtaining orders of protection; family court matters; and civil representation in the areas of consumer/finance, employment, income maintenance, housing, and immigration matters.

65.    The SASP program funds support States in providing intervention, advocacy, accompaniment, support services, and related assistance for, among others, victims of sexual assault, their family and household members, and those collaterally affected by the victimization. *See* 34 U.S.C. § 12511. With SASP grant funds, for example, New York has been able to provide legal services including civil legal advocacy and court accompaniment in both civil and criminal courts.

66.    VAWA specifically authorizes the use of grant funds to strengthen, enlarge, or develop "*victim services and legal assistance programs* including sexual assault, domestic violence, dating violence, and stalking programs, developing or improving delivery of victim services and legal assistance to underserved populations, providing specialized domestic violence court advocates in courts where a significant number of protection orders are granted, and increasing reporting and reducing attrition rates for cases involving violent crimes against women, including crimes of domestic violence, dating violence, sexual assault, and stalking." 34 U.S.C. § 10441 (b)(5) (emphasis added).

67.    Purpose Area 5 of the VAWA statute is clear that legal assistance is a contemplated and allowable purpose and use of funds in programs authorized under the statute, including legal services for "underserved populations." 34 U.S.C. § 10441(b)(5). The statute defines "underserved populations" as "populations who face barriers in accessing and using victim services," and includes "populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age)." 34 U.S.C. § 12291(a)(46). VAWA regulations additionally make clear that "[v]ictim eligibility for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 90.4(c).

## C.  The Byrne JAG program

68.    Byrne JAG is a formula grant program, administered by BJA, that provides funding for criminal justice programming to State and local governments, as well to territories, tribes, and governmental agencies. The Byrne grant program is named after the late Officer Edward Byrne, a young New York City police officer who was felled in the line of duty while protecting an immigrant witness. Joseph P. Fried, *Officer Guarding Drug Witness is Slain*, N.Y. Times, Feb. 27, 1988, at A1.

69.    The Byrne JAG program was codified in its current form in 2006; its predecessor was a federal block grant, authorized by the Omnibus Crime Control and Safe Streets Act of 1968, which provided funding to State and local governments for law enforcement and criminal justice programs. Pub. L. No. 90-351, Title I, 82 Stat. 197 (1968). In creating this block grant program, Congress found that "crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively." *Id*. The federal block grant program gave State and local governments wide latitude in the use of these funds. *See Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (considering the 1968 Omnibus law and finding that the "dominant concern

17

of Congress . . . was to guard against any tendency towards federalization of local police and law enforcement agencies" and that "[e]ven more important than Congress' search for efficiency . . . was its fear that overbroad federal control of state law enforcement could result in the creation of an Orwellian 'federal police force'").

70.     In 2006, the Byrne JAG grant program was codified in its current form as a formula grant to State and local entities. 34 U.S.C. §§ 10151-58. The purpose of the Byrne grant programs, consistent with that of the Omnibus Act of 1968 from which the program originated, is to "make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice or civil proceedings." 34 U.S.C. § 10152. Among the original allowable uses of these monies are "prosecution and court programs," and "crime victim and witness programs." 34 U.S.C. §§ 10152 (a)(1)(A)-(H). Furthermore, the general provisions governing DOJ's justice system improvement programs define "criminal justice" as

> activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not limited to prosecutorial and *defender services*, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency.

34 U.S.C. § 10251(a)(1) (emphasis added).

71.     Plaintiff State Illinois included support for public defense services as one of its seven Byrne JAG priority areas in its 2024-2029 Strategic Plan.  It set this as priority after criminal justice stakeholders identified that the lack of public defender staff hindered the entire criminal justice process, particularly in rural areas facing a smaller labor pool with climbing caseloads.  In

reliance on this plan, Illinois in 2025 subgranted a portion of its Byrne JAG funds directly to seven public defender's offices to ensure adequate staffing at courts facing a shortage of staff. Those awards open in October 2025.

72.    Similarly, for Plaintiff State Michigan, a portion of the State's Byrne JAG grant funds indigent defense services, including the State's appellate defender office's services in priority population drug courts. Michigan and its subgrantees currently do not screen participants in this program for immigration status.

73.    Plaintiff State Washington seeks to increase the capacity of its local communities to respond to social problems and challenges, RCW 43.330.070, including by using federal grants to support community services, advocacy for low-income people, and public safety, *see* RCW 43.330.050. Accordingly, Washington has used Byrne JAG funds to increase the capacity of subgrantees to provide culturally-specific legal assistance to survivors of domestic and sexual violence in order to close the "justice gap" these crime victims often experience when critical legal intervention is needed, as well as to increase the availability of survivor-centered pre-diversion and conviction relief programs.

74.    Plaintiff State Oregon has sub-granted a portion of its Byrne JAG funds to an organization that provides free, open access legal services to Oregonians throughout the state. The organization will use Byrne JAG funds to hire a full-time attorney and full-time paralegal to provide free, drop-in legal services on the nine federally recognized Oregon tribal reservations as well as at six locations in rural Oregon. These legal services include, among other things, assistance with criminal expungement. The organization does not currently screen recipients of these services based on their immigration status.

75.     The Byrne JAG program is a leading source of federal justice funding to state and local jurisdictions, and the use of these funds for indigent defense and other legal services protects the integrity of the criminal justice system.

## II.     Defendants issue the Legal Services Condition, an unlawful condition on grants past and future.

76.     Over a series of communications in August and September 2025, Defendants DOJ and OJP purported to impose a condition on VOCA and Byrne JAG grants restricting the availability of legal services to individuals based on immigration status.

77.     On or about August 18, 2025, Plaintiff States received email notifications with the subject line "Notice Regarding Unallowable Costs" from the OJP setting forth an initial version of the condition. Exhibit 3 (Aug. 18, 2025 notification email to Plaintiff State New York).

78.     Plaintiff State New York, for example, received a separate email with the subject line "Notice Regarding Unallowable Costs" for each of its "open" VOCA and Byrne grant awards—meaning grants for which the awarded funds in the corresponding year had not yet been fully expended, and were still being drawn upon by the State. The open grants[2] for which New York received these notifications included:

- VOCA Victim Assistance for Fiscal Years 2022, 2023, 2024
- VOCA Victim Compensation for Fiscal Years 2023, 2024
- Byrne JAG for Fiscal Years 2022, 2023, 2024

79.     Other Plaintiff States, similarly, received notices for each of their open VOCA Victim Assistance, VOCA Victim Compensation, and Byrne JAG awards.

---

[2] New York also received the same notifications for Byrne JAG awards for Fiscal Years 2018-2021; the VOCA Victim Assistance award Fiscal Year 2021; and the VOCA Victim Compensation award for Fiscal Year 2022. These awards close October 1, 2025, though the remaining balances for the VOCA awards are available subject to a liquidation period.

80.    Apart from the reference to the grant name and number pursuant to which the Plaintiff States' agencies received the notifications, the emails setting forth the new condition were identical:

> Effective immediately upon receipt of this notice, any obligations of funds, at any tier, under this award to provide (or to support the provision of) legal services to any removable alien or any alien otherwise unlawfully present in the United States shall be unallowable costs for purposes of this award, but the foregoing shall not be understood to apply—(1) to legal services to obtain protection orders for victims of crime; or (2) to immigration-related legal services that may be expressly authorized or required by any law, or any judicial ruling, governing or applicable to the award.

81.    On or about September 15, 2025, Plaintiff States received another emailed notification from Defendants regarding the publication of the new DOJ Grants Financial Guide. Exhibit 4 (Sep. 15, 2025 notification email to Plaintiff State New York). As with the August notification, a separate email with the subject line "Notice Regarding Unallowable Costs Under the Award (re: legal services to aliens)" went to each Plaintiff State for each open VOCA (Victim Assistance and Victim Compensation) and Byrne JAG grant. The emails, sent from OJP, included a link to an online version of the September 2025 DOJ Guide, and stated that:

> The notice entitled "Notice Regarding Unallowable Costs Under the Award" that was sent on August 18, 2025 (which this notice supersedes), will be implemented as specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs" ("Legal Services for Aliens"). As provided in the award itself, compliance with the DOJ Grants Financial Guide is a material requirement of the award. The award requirement specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs" ("Legal Services for Aliens") will be effective – and will be subject to enforcement under this Federal grant award from the Department of Justice – starting on October 31, 2025.

82.    Plaintiff States understand the "Legal Services for Aliens" section of the September 2025 version of the DOJ Guide, as set forth through the emailed notifications, to be the final Legal Services Condition. *DOJ Grants Financial Guide,* https://www.ojp.gov/doj-financial-guide-2024 (last visited September 30, 2025) [https://perma.cc/HZ8K-CNPR]. The Condition states that:

21

Except as indicated in the following sentence, costs of providing legal services (that is, professional services of the kind lawfully provided only by individuals licensed to practice law) to any removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States are disallowed and may not be charged against the award.

Costs for legal services disallowed under the preceding sentence do not include costs for legal services— (1) to obtain protection orders for victims of crime (including associated or related orders (e.g., custody orders), arising from the victimization); (2) that are associated with or relate to actions under 18 U.S.C. ch. 77 (peonage, slavery, and trafficking in persons); (3) to obtain T-visas, U-visas, or "continued presence" immigration status (see, e.g., 8 U.S.C. § 1101(a)(15)(T) & (U); 22 U.S.C. § 7105(c)(3)(A)); or (4) as to which such disallowance would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

83.    On or about September 17, 2025, Plaintiff States received notifications of their VOCA Fiscal Year 2025 Pre-Acceptance Award Packages (for both Victim Assistance and Victim Compensation). Among the conditions included in each package was the following reference to the DOJ Guide:

Compliance with DOJ Grants Financial Guide

References to the DOJ Grants Financial Guide are to the DOJ Grants Financial Guide as posted on the OJP website (currently, the "DOJ Grants Financial Guide" available at https://ojp.gov/financialguide/DOJ/index.htm), including any updated version that may be posted during the period of performance. The recipient agrees to comply with the DOJ Grants Financial Guide.

84.    Plaintiff States, having received award packages for VOCA Fiscal Year 2025 that included the above provision referencing the DOJ Guide, understand the Legal Services Condition to apply to these current grants, in addition to the past-awarded "open" grants for which they received emailed notifications.

85.    Plaintiff States received VAWA 2025 award packages from OVW in the middle of August 2025. These packages included the following condition, which references the DOJ Guide:

Applicability of Part 200 Uniform Requirements and DOJ Grants Financial Guide

The recipient agrees to comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by the Department of Justice (DOJ) in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements"), and the current edition of the DOJ Grants Financial Guide as posted on the OVW website, including any updated version that may be posted during the period of performance. The recipient also agrees that all financial records pertinent to this award, including the general accounting ledger and all supporting documents, are subject to agency review throughout the life of the award, during the close-out process, and for three years after submission of the final Federal Financial Report (SF-425) or as long as the records are retained, whichever is longer, pursuant to 2 C.F.R. 200.334, 200.337.

86.    Based on the inclusion of the reference to the DOJ Guide, and in particular the language indicating that grantees are to comply with "the current edition of the DOJ Grants Financial Guide as posted on the OVW website, including any updated version that may be posted during the period of performance," Plaintiff States understand the Legal Services Condition to be applicable to VAWA 2025 awards.

87.    Moreover, because past years' VAWA awards, upon information and belief, also contained similar language requiring compliance with any updated versions of the DOJ Guide posted during the period of performance, Plaintiff States understand the Legal Services Condition to be appliable to all open VAWA awards.

88.    Beyond VOCA, VAWA, and Byrne JAG awards, in including the Condition in the DOJ Guide, Defendants appear to seek to impose it across-the-board. The manual acknowledges that "there may be instances where the requirements may differ among" the three main grant-making components within DOJ that use the DOJ Guide ((1) OJP, (2) OVW, and (3) COPS). Ultimately, however, nearly all DOJ grants seem to require compliance with the DOJ Guide, and any updates thereto that arise during grants' performance periods. Moreover, on or about

23

September 30, 2025, Plaintiff States received an additional emailed notification from OJP announcing the inclusion of the Legal Services Condition in the DOJ Guide, and reiterating the Guide's applicability to all three grant-making components. Exhibit 5 (Sep. 30, 2025 notification email to Plaintiff State New York). In including the Legal Services Condition in a DOJ manual that is common to grants across all three components, Defendants appear to seek a categorial application of the Legal Services Condition across all grants administered by these offices.

89.    Plaintiff States are subject to the Legal Services Condition as both direct grantees and as pass-through entities that provide subawards to subrecipients (also known as "subgrantees"). Examples of subrecipients include local government entities and community-based organizations that contribute to the objectives of the Federal award. As pass-through entities, Plaintiff States are required, by federal regulation and by the DOJ Guide, to "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward." 2 C.F.R. § 200.332(e); DOJ Grants Financial Guide § 3.14. These monitoring obligations include conducting audits for certain subrecipients, reviewing financial and performance reports, reviewing financial operations and activities, ensuring corrective actions are taken when needed, and other related measures. *See* 2 C.F.R. § 200.332(e); DOJ Grants Financial Guide § 3.14 at 107-09. The DOJ Guide also provides: "Where the conduct of a program or one of its components is delegated to a subrecipient, the direct recipient is responsible for all aspects of the program including proper accounting and financial recordkeeping by the subrecipient." DOJ Grants Financial Guide § 3.14 at 110.

90.    The DOJ Guide does not provide any specific guidance regarding how pass-through entities should monitor subrecipient compliance with the Legal Services Condition which, in turn, exposes Plaintiff States to a heightened risk of funding loss should a subgrantee fall short of

complying with Defendants' interpretation of the Legal Services Condition or should a passthrough fall short of meeting Defendants' ambiguous compliance expectations.

**III.    The Legal Services Condition violates both the Constitution and the Administrative Procedure Act.**

91.    Imposing the Legal Services Condition (as set forth in the DOJ Guide and implemented through the emailed notices) on any "open" grants awarded prior to 2025 violates the Spending Clause's prohibition against retroactive, post-acceptance conditions.

92.    The Legal Services Condition, as set forth in the DOJ Guide, is also ambiguous in violation of the Spending Clause; arbitrary and capricious in violation of the APA; and, as to VAWA and VOCA Victim Assistance grants, contrary to law in violation of the APA.

**A.    The Legal Services Condition is a retroactive and ambiguous condition in violation of the Spending Clause.**

**a.    As to all "open" awards, the condition is retroactive.**

93.    The Legal Services Condition purports to apply to each grant for which a notification of the same was received via email in August and September of this year. Many of these "open" grants were awarded to States years ago and have been drawn from since then. Through its inclusion in the DOJ Guide, it may also apply to various other open DOJ grants that did not receive emailed notifications, but that remain open and subject to broad conditions requiring compliance with all future versions of the DOJ Guide issued during a grant's performance period.

94.    Under VOCA, the "award period" of a given year's grant is that year, plus the three subsequent years.  34 U.S.C. § 20101(e). At the end of that four-year period, States may seek an extension from the Attorney General to continue to spend that award down. Practically speaking, this means that an award period for a FY 2021 VOCA grant would be FY 2021 through FY 2024.

If all of the funds from FY 2021 were not spent by the conclusion of FY 2024, a grantee State could seek, from the Attorney General, an extension for the use of those funds. *Id*. Because of how the statute defines VOCA's award period, the Legal Services Condition imposes the new policy on funds years after they were awarded and accepted, and years after States made subgrantee awards based on the terms and conditions in effect at the time of acceptance.

95.     The performance period of a Byrne JAG award is typically four years, meaning that the award remains open for a four-year period, subject to extension at the discretion of DOJ. Any program activities supported by the awarded funds must be completed within the time the award remains open. After the award closes, any remaining unpaid obligations from such program activities must be paid within 120 days of the close date.

96.     The Spending Clause prohibits the imposition of post-acceptance conditions on grants. While the government can impose conditions on federal funds, this authority does "not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp'l v. Halderman*, 451 U.S. 1, 25 (1981). Yet this is precisely what Defendants have done. As established by the emailed notifications received by Plaintiff States, Defendants intend for the Condition to apply to at least all open VOCA and Byrne JAG awards, and potentially to other open awards (such as VAWA), attempting to change the conditions of these awards midstream, in violation of *Pennhurst*. Officials in Plaintiff States making acceptance decisions with respect to these past grants could not have known the obligations that would be imposed years after the States accepted the grants.

97.     Defendants' attempt to impose the Condition retroactively on grants awarded and accepted years before the emailed notifications is an axiomatic violation of the Spending Clause's prohibition on retroactive, post-acceptance conditions.

26

**b.  The Condition is ambiguous in violation of the Spending Clause.**

98.    Moreover, the Spending Clause disallows conditions, like the Legal Services Condition, that are ambiguous. The "legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms" of the grant before it, and "[t]here can . . . be no knowing acceptance if a State is unaware of the conditions or *is unable to ascertain what is expected of it*. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp'l*, 451 U.S. at 17 (emphasis added).

99.    In determining whether a condition in a federal fund is "ambiguous" for the purposes of the Spending Clause, courts must view the condition "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the funds] and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

100.    The officials tasked with implementing these awards for Plaintiff States cannot reasonably discern the contours of the newly imposed Legal Services Condition, which are unclear and ambiguous in three key respects. First, the conduct targeted by the Condition is unclear. Second, the language regarding which "aliens" are to be excluded is unclear. Third, the Condition is unclear as to what conduct is required of Plaintiff States in order to comply, and how they are expected to ensure subgrantees' compliance.

**i.    The conduct targeted by the Legal Services Condition is unclear.**

101.    The Legal Services Condition includes, among others, exceptions for costs for legal services (i) "to obtain protection orders for victims of crime (including associated or related orders (e.g., custody orders), arising from the victimization)," and (ii) "as to which [the] disallowance

would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award." From this language, it is not clear which legal services would be deemed to be "associated or related orders" or an "express requirement of any law, or of any judicial ruling," and therefore *not* an unallowable cost as to the excluded group of individuals. The exceptions are unclear and ambiguous.

102.    First, although legal services to obtain "orders" that are "associated or related" to protection orders are exempt, it is not clear what an "associated or related" order must be for the legal services necessary to secure it to be an allowable cost. For instance, in this context, "associated or related" could mean additional non-emergency orders related to orders of protection and custody (e.g., ongoing final custody proceedings stemming from the victimization, but occurring months or even years later). It could also mean additional emergency orders related to contexts beyond criminal or family court (e.g., emergency housing orders). As a result, the full scope of legal services that fall under the "associated or related orders" exception is unclear.

103.    Second, the exception concerning legal services "as to which disallowance would contravene any express requirement of any law, or of any judicial ruling" is also ambiguous. Defendants have provided guidance concerning neither which "laws" are subject to the exception, nor what constitutes an "express requirement." In the context of VOCA and VAWA, this uncertainty is acutely problematic.

104.    In the VOCA context, where Defendants' own regulations provide a broad (but non-exhaustive) list of legal services that are "[a]llowable direct service costs," *see* 28 C.F.R. §§ 94.119(a)(10), (f), eligibility is similarly "not dependent on the victim's immigration status," *id.* § 94.116. In promulgating the VOCA regulations, Defendants provided numerous other examples, "which are merely illustrative, and not meant to be a comprehensive listing," of allowable legal

services that "may be appropriate," including, among other civil legal services, "intervention with creditors, law enforcement (e.g., to obtain police reports), and other entities on behalf of victims of identity theft and financial fraud" (which may be relevant in instances of domestic violence coupled with financial coercion), and campus administrative stay-away orders. *See* 81 Fed. Reg. 44515-01, 44524 (Jun. 8, 2016). DOJ previously explained that it intentionally left the scope of allowable direct services so broad because States are best positioned to make a reasoned judgment, based on experience and local context, as to which legal services will best serve crime victims. *See id.* (providing that "States retain broad discretion to set limits on the type and scope of legal services that it allows its sub-recipients to provide with VOCA funding" and recognizing that "the available resources [for victims and witnesses] in each State differ").

105.    The VAWA statute and regulations are similarly clear that a broad scope of legal services are considered allowable costs. The statute itself defines "legal assistance" as "assistance provided . . . to an adult, youth, or child victim of domestic violence, dating violence, sexual assault, or stalking, relating to," *inter alia*, "divorce, parental rights, child support, Tribal, territorial, immigration, employment, administrative agency, housing, campus, education, healthcare, privacy, contract, consumer, civil rights, protection or other injunctive proceedings, related enforcement proceedings, and other similar matters." 34 U.S.C. § 12291(a)(24). *See also* 34 U.S.C. § 12291(a)(51) (defining "victim services" and "services" to include "legal assistance and legal advocacy"); 34 U.S.C. § 10441(b)(10) (allowing VAWA STOP grant monies to be used for "assistance to victims of domestic violence and sexual assault in immigration matters."). While the statute lists a number of forms of legal services that are contemplated, they are clearly not to be considered a closed and exhaustive list, allowing legal assistance for "other similar matters."

29

106.    VAWA regulations also contemplate a range of legal services that are allowable for victims and survivors, including "legal services programs."  28 C.F.R. § 90.17(a). Finally, VAWA regulations clearly provide that "[v]ictim eligibility for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 90.4(c).

107.    Defendants' Legal Services Condition makes no mention of VOCA and VAWA's extensive statutory and regulatory provisions regarding the allowability of many kinds of legal services to victims irrespective of immigration status, even though these provisions appear to directly contradict the Condition. Defendants' lack of acknowledgment, let alone explanation, for this apparent irreconcilable conflict between these statutes and regulations, and the Condition— which Defendants sent and purport to apply to recipients of both awards—strongly suggests that Defendants may not consider the statutes or their own regulations, to contain a sufficiently "express requirement of . . . law," to satisfy the Condition's exception.

108.    Defendants' Legal Services Condition could be interpreted to create an end-run around these laws and regulations, simply because each and every type of legal services cost conceivably related to a person's victimization is not listed in the relevant provisions, and therefore may not be considered "express." Moreover, for VOCA, such an interpretation would be a violation of the regulations and run afoul of the reasoning provided in the Final Rule, which itself provides an even larger non-exhaustive list of examples of allowable costs. It is unclear from the language of the Condition whether these types of legal services, clearly considered in the Final Rule and intended to be among the types of costs that States could allow under 28 C.F.R. § 94.119(f), are exempted under the Condition as "express" requirements of law, or will now be considered unallowable by Defendants.

109.    The "express requirement of any law" exception also creates ambiguity with respect to legal services funded through Plaintiff States' Byrne JAG awards. The Byrne JAG statutes expressly permit the use of funding for "personnel" for "criminal justice . . . proceedings," 34 U.S.C. § 10152(a)(1), which includes public "defender services," *id.* § 10251(a)(1). Even though Congress surely understood when drafting that provision that—consistent with the Constitution's guarantee that criminal defendants have a right to counsel—public defenders represent clients regardless of their immigration status, the statute does not expressly provide that defender services shall be offered without regard to immigration status. *See id.* § 10152(a)(1). It is unclear, however, whether this statutory authorization—which does not impose any restriction based on immigration status—provides a sufficiently "express requirement" such that Plaintiff States may continue funding the cost of legal services, like defender services, with their Byrne JAG awards.

### ii.    The set of individuals to be excluded by the Legal Services Condition is unclear.

110.    The Legal Services Condition is also unclear as to which individuals are meant to be excluded from legal services under its restrictions. The Condition states that such services may not be provided to a "removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present." But the determination of whether a person is "removable" under 8 U.S.C. § 1229a(e)(2), or "otherwise unlawfully present"[3] requires a complex inquiry—one that immigration judges or adjudicators may take years to decide in administrative proceedings. Moreover, the construction of the exception itself creates ambiguity: the Condition seems to imply that anyone who is "removable" is also "unlawfully present." But that is not the case. For example, a lawful

---

[3] "Unlawfully present" is not explained or defined in the Condition or the DOJ Guide, though it is a term that exists in the INA as a ground of inadmissibility, *see* 8 U.S.C. § 1182(a)(9)(B), with its own set of complex provisions and exceptions.

31

permanent resident can be "removable" under § 1229a(e)(2) without ever having a period of "unlawful presence."

111.    There is no indication that Defendants, in issuing the Legal Services Condition, considered either the complexity of making such a judgment, or the detailed inquiry needed to reach a conclusion on this question. This is not to say that every assessment of whether a person's immigration status renders them eligible for a federal program requires a state agency to await the disposition of an administrative proceeding that may take years. Rather, the ambiguity lies in the fact that the Condition's language is unique and ambiguous, incorporates complex immigration law terms, and is not elucidated by any guidance that provides a structure or process for making this assessment.

### iii.    The method for determining excluded individuals under the Legal Services Condition is unclear.

112.    Relatedly, the Legal Services Condition is ambiguous because it provides no guidance as to how recipients should identify individuals to whom allowable legal services can no longer be provided. For example, it is not clear whether the Condition places an affirmative responsibility on Plaintiff States (or their subgrantees) to develop protocols to screen individuals by immigration status before providing legal services to them, whether the Condition instead expects Plaintiff States to entirely sever ties with subgrantees that primarily serve populations that may include noncitizens who are removable or unlawfully present, or whether the Condition requires Plaintiff States (and their subgrantees) to withhold services only to individuals whom they know to be removable or unlawfully present. Under the Legal Services Condition, Plaintiff States are left with considerable uncertainty regarding a question that is fundamental to how their operations, and those of their subgrantees, will need to work.

113.    By contrast, for example, the Medicaid program, for which citizenship or certain immigration status is statutorily required for eligibility, provides a host of detailed regulations as to which categories of non-citizens are eligible, for which parts of the Medicaid program, and pursuant to which forms of proof. *See* 8 U.S.C. §§ 1641(b), (c) (defining "qualified alien" for the purposes of Federal public benefits); 8 U.S.C. § 1611(b)(1)(A) (creating an exemption for eligibility requirements in emergency and similar circumstances); 42 C.F.R. § 435.910 (providing guidance as to use of Social Security numbers in eligibility verification). Unlike the Medicaid context, where clear consideration was given to both the immigration-related eligibility requirements and the operationalizing of these requirements, the Legal Services Condition merely provides that it applies to legal services for "removable alien[s] (see 8 U.S.C. § 1229a(e)(2)) or any alien[s] otherwise unlawfully present," and leaves Plaintiff States and subgrantees to make their best guesses as to the proper ways to make these determinations—ones that they have never had to make before in this context.[4]

114.    For all of the foregoing reasons the Legal Services condition is unclear and ambiguous in violation of the Spending Clause.

**B.    The Legal Services Condition is arbitrary and capricious.**

115.    The Condition is also arbitrary and capricious, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(a). An "arbitrary and capricious" agency action is one that is neither "reasonable [nor] reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agencies must provide a "satisfactory explanation" for their actions, and this must

---

[4] In fact, as to VOCA, the only guidance that the regulations do contain as to immigration, is guidance that plainly states that, for both States and subgrantees, "victim eligibility . . . for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 94.103(a); *see also* 28 C.F.R. § 94.116. In the VAWA context, the regulations are equally clear that "[v]ictim eligibility for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 90.4(c).

include a "rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

116.    First, Defendants have provided no reasoning whatsoever when issuing the Legal Services Condition, much less reasoning that draws any connection between facts found and choices made. The only correspondence that Plaintiff States have received with respect to the Condition are the August and September emails, the latter of which references and links to the DOJ Guide. With respect to the Condition, the DOJ Guide provides no more than the language of the Condition itself. No further explanation, guidance, reference, or authority is provided to demonstrate a relationship between Defendants' findings and a resulting decision to impose the Legal Services Condition.

117.    Second, the Condition changes Defendants' longstanding position that access to legal services under these OJP and OVW grants is *not* a function of immigration status. Defendants' "[s]udden and unexplained change" represented by the Condition "does not take account of legitimate reliance on prior interpretation[s]" held by Plaintiff States. *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). It is "arbitrary and capricious" to not consider "longstanding policies [that] may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotations omitted).

118.    Third, in including the Legal Services Condition into the DOJ Guide, Defendants appear to seek to apply this condition across-the-board to all DOJ grants. Defendants have not explained the appropriateness of a categorial application of the Condition, nor is there any indication that they have considered the various, complex statutory schema and purposes

underlying each of the distinct grant programs at issue. An agency simply cannot impose grant conditions without first ensuring that the relevant statute supports them. *See New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. Mar. 6, 2025) (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority"), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 10, 2025); *see also, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (concluding that DOJ lacked statutory authority to impose immigration enforcement conditions on Byrne JAG grants). Here, in imposing a blanket Condition across a broad set of federal grants, there is no indication that Defendants have conducted an inquiry into whether the Legal Services Condition is consistent with the statutory authority underlying each grant program. Defendants have pointed to no authority demonstrating that Congress intended for the agency and offices implementing these programs to condition an individual's access to these programs on that person's immigration status. Defendants have thus "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43.

119.    Fourth, the Condition is arbitrary and capricious because Defendants "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43. In their overnight change to the longstanding grant conditions allowing these services regardless of immigration status, Defendants have failed to consider that, imposing this new immigration-related condition may run afoul of the core purposes of these grant programs—particularly the VOCA and VAWA programs, which are premised on the principle that *all* victims should be enabled to  participate in the criminal matters underlying their own victimization, *on an equal basis* and without fear of adverse consequences. This is a matter of both victims' dignity *and* public safety.

120.    Defendants have also failed to consider that, in some Plaintiff States, state laws and policies prohibit public officers from requesting immigration-related information from individuals without a legally required basis for the request. For example, New York's Executive Order 170 establishes that no "State officers . . . shall inquire about an individual's immigration status unless . . . the status of such individual is necessary to determine his or her eligibility for a program, benefit, or the provision of a service." New York Exec. Order 170 (Sept. 15, 2017). Because, for example, the VOCA regulations are clear that an individual's immigration status is not relevant to their eligibility for VOCA services, New York's agency administering VOCA subgrants, the Office of Victim Services, could not lawfully make such a request to a person seeking services under VOCA services. The same is true for the Division of Criminal Justice Services, New York's VAWA-administering agency.

121.    Other Plaintiff States have similar policies. In Colorado, for example, State and local subdivision employees are prohibited from requesting certain personal information, except as required by state or federal law, as necessary to perform their duties, or to verify eligibility for certain federal benefits. C.R.S. § 24-74-104. *See also* ORS 181A.823(1)(b) (Oregon); Cal. Gov. Code Sec. 12900 *et seq*. (California).

122.    Because the regulations are equally clear that immigration status is not an eligibility factor for VOCA Assistance or VAWA services provided by subgrantees, *see* 28 C.F.R. § 94.103(a); 28 C.F.R. § 94.116; *see also* 28 C.F.R. § 90.4(c), there is similarly no reason for them to have developed any staffing, training, or procedures to screen victims' or witnesses' immigration statuses before providing VOCA Assistance or VAWA-funded services. Nor have any recipients of Byrne JAG funding for court programming and defense services had any reason to develop the staffing, training, or procedures necessary to request or, if required, screen for immigration status.

123.     Fifth, and relatedly, Defendants have failed to consider the substantial reliance interest of Plaintiff States on their existing systems and infrastructures around administering and monitoring these federal grants—none of which has, before the Condition, needed or included any sort of immigration verification. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS*, 591 U.S. at 30 (internal citation omitted). There is no indication that Defendants, prior to issuing the Legal Services Condition, analyzed or understood that identifying "any removable alien or any alien otherwise unlawfully present in the United States" is an entirely distinct task from anything that Plaintiff State agencies already do in the regular course of their work.

124.     As discussed, *supra*, the process of verifying whether someone is "removable" or "unlawfully present" is not a simple inquiry, and requires expertise, training, and systems that Plaintiff States' agencies generally do not have. Other federal programs for which immigration status is a statutorily required eligibility factor provide guidance to States as to how to feasibly make such an assessment within the program's operations. *See e.g.*, 8 U.S.C. §§ 1641(b), (c) (under Medicaid, defining "qualified alien" for the purposes of Federal public benefits); 8 U.S.C. § 1611(b)(1)(A) (creating an exemption for eligibility requirements in emergency and similar circumstances for Medicaid); 42 C.F.R. § 435.910 (providing guidance as to use of Social Security numbers in Medicaid eligibility verification). In this instance, Defendants have provided nothing of the sort, nor have they indicated any plans to do so.

125.     This omission is substantial. For example, if the Legal Services Condition were read to require states and subgrantees to affirmatively screen individuals for immigration status, Plaintiff States' VOCA-, VAWA-, and Byrne JAG-administering agencies (and their subgrantees)

would need considerable additional resources—including specialized immigration-related expertise and appropriate verification systems—to be able to oversee subgrantee compliance with the Legal Services Condition. Indeed, the DOJ Guide and applicable regulations require such monitoring (though without any guidance as to monitoring of this particular condition). *See* 2 C.F.R. § 200.332(e); DOJ Grants Financial Guide § 3.14. State agencies may also need to change their operating models to accommodate the Condition's immigration verification requirement.

126.    Furthermore, the transformation potentially required of Plaintiff States' agencies would be particularly significant in the VOCA and VAWA contexts, where individuals seeking services are enmeshed with highly sensitive matters related to crime, safety, and domestic abuse. Oftentimes, a crime victim who is fleeing an abusive situation—*irrespective of that person's immigration or citizenship status*—will not physically possess the legal documents they may need in order to demonstrate their immigration status. It is well-documented that an abuser restricting a victim's access to their important legal documents is a common manifestation of coercion, control, and domestic abuse. *See e.g.* Wash. Rev. Code Ann. § 7.105.010 (enumerating forms of "coercive control" for purposes of domestic violence protective orders, including "[e]xerting control over the other party's identity documents"); Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 198 (2006).

127.    Imposing what may essentially be an affirmative requirement that victims demonstrate that they are not "removable" or "otherwise unlawfully present" in order to be eligible for VOCA- or VAWA-funded legal services would also foreseeably impact many victims, *including citizens*, for whom the reality of recent proximity to crime may make it dangerous, or even impossible, to gather and present legal documentation of status before acutely needing

services. There is no indication that this is an outcome that Congress intended for these grant programs, and Defendants may not override Congress's reasoned judgment through an e-mail or an update to the DOJ Grants Financial Guide.

128.    Sixth, the ambiguities inherent in the Legal Services Condition, as discussed, *see supra* Part III (A)(b), also independently render it arbitrary and capricious insofar as it fails to explain how the Plaintiff States should interpret the multiple ambiguities that Plaintiff States would need to resolve to determine how to comply, and how to monitor compliance.

129.    Finally, the Legal Services condition is arbitrary and capricious because it purports to apply retroactively to previously awarded grants. Defendants have provided no reasoned explanation for the application of the Condition retroactively. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (applicable federal grants terms are based on "the law in effect when the grants were made," not retroactive changes in substantive requirements made after).

### C.    As to VAWA and VOCA Victim Assistance, the Legal Services Condition is contrary to law.

130.    VAWA was passed to address the "escalating problem of violence against women" and "to remedy not only the violent effects of the problem, but the subtle prejudices that lurk behind it." S. Rep. 103-138, 37, 42 (1993); Pub. L. No. 103-322, tit. IV, 108 Stat. 1796 (1994). Consistent with this, the VAWA statute and regulations make clear, in multiple places, that legal services are to be construed broadly and that immigration status is not an eligibility criterion for access to such services. At the outset, the statute defines "legal assistance" to include assistance in immigration matters. 34 U.S.C. § 12291(a)(24). The same provision lists many illustrative types of legal services that States and subgrantees may provide to victims under VAWA, including consumer matters, contract matters, immigration matters, and many more. 34 U.S.C. § 12291(a)(24)(C)(i).

131.    Elsewhere in the statute, VAWA's STOP grant program expressly contemplates funding "victim services and legal assistance programs, including sexual assault, domestic violence, dating violence, and stalking programs," 34 U.S.C. § 10441(b)(5), including legal services aimed at "populations underserved because of," among other factors, "alienage status." 34 U.S.C. § 12291(a)(46). Consistent with this, VAWA regulations are clear that "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status." 28 CFR § 90.4(c).

132.    An original purpose of the VOCA program was to support inadequately funded state and local victim assistance programs "with minimal bureaucratic 'strings attached,' for … service programs to assist victims of crime." S. Rep. No. 98-497, at 1, 3 (1984). Other purposes were "to encourage states to provide assistance to victims of crime within their borders regardless of the victim's residence," and to "create a safe and welcome environment for victims who will be involved in the criminal justice system." *Id*. at 5.

133.    Consistent with these stated purposes, the VOCA Victim Assistance program prohibits restricting victims' and witnesses' access to program-provided services based on immigration status. The regulations state plainly that "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 94.103(a). This mandate is significant enough to VOCA's Victim Assistance program that the regulations restate identical language in the section, this time directed towards subgrantees specifically: As to subgrantees, "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 94.116.

134.    The Legal Services Condition contravenes these statutory and regulatory provisions several times over, stating that the costs associated with providing legal services "to any removable

alien (*see* 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States are disallowed" under the VAWA and Victim Assistance programs. While the Condition contains an exception for legal services for which "disallowance would contravene any express requirement of any law," it does not acknowledge the conflicting VOCA and VAWA provisions, or explain how the Condition and provisions could fit together.

135.    The Legal Services Condition is contrary to law with respect to the VAWA and VOCA Victim Assistance programs, and their clear directives that direct services under the program, including legal services, not be withheld from individuals based on immigration status.

**IV.    Harm to Plaintiff States**

136.    The imposition of the Legal Services Condition presents Plaintiff States with two equally untenable choices. First, the States could attempt to adhere to the Legal Services Condition, which could require them to transform their States' VOCA, VAWA, and Byrne JAG operations (and, potentially, those of other federal grant programs administered by the DOJ and subject to the DOJ Guide), restrict access to certain services for certain individuals, demand that their subgrantees somehow do the same, and endeavor to monitor subgrantees' compliance.

137.    Not only would this course run directly afoul of VOCA Victim Assistance and VAWA regulations, but it would immediately create immense compliance and monitoring costs for Plaintiff States. It would also undermine the trust that Plaintiffs States' victim advocacy and law enforcement agencies, using the very resources provided by these grant programs, have worked hard to build with victims and witnesses across the States over the past four decades.

138.    The other option available to Plaintiff States is to forgo the unspent monies that the States have already been awarded by the formula grants rather than risk contravening the Condition. For some Plaintiff States, this could mean materially scaling back services available to

victims and other individuals across the states, likely having immediate impact in rural areas that are already resource-limited.

139.    To be clear, either of these choices would significantly undermine Plaintiff States' VOCA and VAWA programs and victim services generally. Likewise, either path leads to a possible retreat to the status quo before these watershed statutes were adopted.

140.    In the Byrne JAG context, impacted Plaintiff States would be required to choose between complying with the Legal Services Restriction, imposing additional limitations and strain on already under-resourced court programs, or forgoing their unspent funds, which will result in staffing shortages and cuts to services that were reliant on the availability of federal funds. Either option undermines the purpose of Byrne JAG to afford States flexibility to craft programs that improve the criminal justice system.

141.    Plaintiff States face proprietary injuries stemming from the substantial new costs and operational burdens to comply with the Legal Services Condition, particularly if Plaintiff States are required to affirmatively determine whether recipients of funded services are removable or unlawfully in the United States or are required to monitor compliance by subgrantees

142.    The Legal Services Condition will also undermine the mission and efficacy of Plaintiff States' own crime victim programs, causing negative impacts on public safety in Plaintiff States.

143.    Plaintiffs face further proprietary injuries because they face the threat of enforcement, jeopardizing federal funding that Plaintiff States receive. The Legal Services Condition will go into effect October 31, and the threat of losing funding if States do not change their practices is an irreparable injury. *See Cal. v. Trump*, No. 25-cv-10810, 2025 WL 1667949, at *17 (D. Mass. June 13, 2025). The harms that the Legal Services Condition could impose on the

Plaintiff States cannot be remedied by payments at the conclusion of a lengthy litigation. Accordingly, declaratory, preliminary and permanent injunctive relief is needed from the Court.

## FIRST CAUSE OF ACTION

### Violation of U.S. Constitution
### Spending Clause

144.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

145.    The government can impose conditions on federal funds, but this power does "not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp'l*, 451 U.S. at 25.

146.    When imposing conditions on funding, the government must also do so "unambiguously," *id*. at 17, and in a manner that enables State grantees to "knowingly decide whether or not to accept those funds." *Id.* at 24.

147.    Defendants have violated both of these limits here. Defendants purport to impose an ambiguous and unclear condition on open grants that were awarded years ago, surprising Plaintiff States with a new condition that is entirely distinct from any conditions previously "knowingly" accepted. The Spending Clause prohibits this.

148.    The Legal Services Condition that Defendants purport to impose is also improperly ambiguous. The Condition is unclear as to what constitutes "legal services" and which groups of victims and other individuals are to be excluded from those services, including how state agencies (and subgrantees) are to identify which victims and individuals to exclude.

149.    The Legal Services Condition will cause significant, imminent, and irreparable harm to Plaintiff States and to their programs that support crime victims and witnesses, and their

families, as well as, for example, public defender's offices that play an essential role in ensuring the efficiency of the criminal justice system.

150.    Because it violates the Spending Clause's prohibition on retroactive conditions, the Legal Services Condition as to open awards should be declared unconstitutional and preliminarily and permanently enjoined.

151.    Because the Legal Services Condition generally (both retrospectively and prospectively) is also ambiguous in violation of the Spending Clause, the Condition should be declared unconstitutional in full and preliminarily and permanently enjoined.

## SECOND CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Arbitrary and Capricious Agency Action

152.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

153.    The Legal Services Condition became immediately effective and is a "final agency action" for the purposes of the APA. 5 U.S.C. § 704.

154.    Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51 (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account").

155.    A court must also set aside agency action if the agency "failed to consider . . . important aspects of the problem before" it. *Regents of the Univ. of Cal.*, 591 U.S. at 25 (citation

omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (emphasis in original).

156.    In imposing the Legal Services Condition, Defendants (i) failed to provide any reasoning at all, (ii) displayed no awareness of the change from longstanding position that the Condition represents, and did not demonstrate a reason for this change, (iii) appear to have imposed a blanket, across-the-board condition on all DOJ grants with no consideration to the distinct statutory schemes and goals underlying each, (iv) failed to consider multiple important aspects of the problem, (v) failed to take into account the considerable reliance interests of Plaintiff States, (vi) have provided no guidance regarding how Plaintiff States are to interpret the many ambiguities inherent in the language of the Condition itself, and (vii) have provided no reasoning for their imposition of a post-acceptance condition. For each of these reasons, the Legal Services Condition is arbitrary and capricious.

157.    By incorporating the Condition in the DOJ Guide, Defendants indicate an intent to apply the Condition to all DOJ grants, without regard for whether there is any underlying statutory authority for such action. Defendants also failed to consider the consequences of the imposition of the Condition on Plaintiff States, the unworkability of an immigration verification requirement in the context of the kinds of legal services that have been funded through these grant programs, and the reliance that Plaintiff States have in the systems they have already developed to comply with longstanding conditions of these programs.

158.    Finally, Defendants have failed to provide any guidance or explanation as to how Plaintiff States are to interpret (and monitor) the many ambiguous aspects of the Condition, and have attempted to apply the Condition retroactively to grants awarded years ago. For all these reasons, the Condition is arbitrary and capricious.

159.    The Legal Services Condition will cause significant, imminent, and irreparable harm to Plaintiff States and to their programs that support crime victims, witnesses, and their families, as well as public defender's offices that play an essential role in ensuring the efficiency of the criminal justice system.

160.    For these reasons, the Legal Services Condition violates the APA and should be declared illegal, set aside, vacated, and preliminarily and permanently enjoined.

### THIRD CAUSE OF ACTION

**Violation of Administrative Procedure Act**
**Agency Action Contrary to Law (VAWA and VOCA Victim Assistance)**

161.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

162.    The Legal Services Condition became immediately effective and is a "final agency action" for the purposes of the APA. 5 U.S.C. § 704.

163.    The APA requires that a court set aside agency action that is "not in accordance with law." *Id*. § 706(2)(A).

164.    The VAWA statute and regulations disallow immigration status as an eligibility factor for accessing VAWA services. *See* 34 U.S.C. § 12291(a)(24); 34 U.S.C. § 10441(b)(5); 28 C.F.R. § 90.4(c). VOCA Victim Assistance regulations state the same. 28 C.F.R. §§ 94.103(a), § 94.116 (providing that "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status.").

165.    Under the APA, courts are "to set aside federal agency action that is 'not in accordance with law.'" *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). An agency is "bound by its own regulations so long as they remain in force." *Wallace v. Christensen*, 802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (citing *United States ex*

*rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954)). Furthermore, an agency must comply with its "own regulations and policies." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025). The Condition directly contradicts VOCA regulations stating the immigration status is not an eligibility factor for services; as an action contrary to Defendants' own regulations, the Legal Services Condition must be set aside as contrary to law.

166.     The Legal Services Condition will cause significant, imminent, and irreparable harm to Plaintiff States and to their programs that support crime victims and witnesses, and their families.

167.     For these reasons, the Condition violates the APA and should be declared illegal, set aside, vacated, and preliminarily and permanently enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.  Declare that Defendants' imposition of any aspect of the Legal Services Condition is contrary to the Spending Clause and the Constitution;

b.  Declare that Defendants' imposition of any aspect of the Legal Services Condition is arbitrary and capricious in violation of the APA;

c.  Declare that Defendants' imposition of any aspect of the Legal Services Condition as to the VAWA and VOCA Victim Assistance programs is contrary to law in violation of the APA;

d.  Stay the policy of imposing the Legal Services Condition on any grants for which it has been imposed, and stay the inclusion of the Legal Services Condition in the DOJ Guide (including as incorporated in any future version of the DOJ Guide), pursuant to 5 U.S.C. § 705;

e.  Preliminarily and permanently enjoin Defendants from implementing or enforcing any aspect of the Legal Services Condition, including its inclusion in the DOJ Guide, in or against the Plaintiff States;

f.  Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

g.  Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees; and,

h.  Award such additional relief as this Court may deem just and proper.

Dated: October 1, 2025                                    Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Natasha M. Korgaonkar*
Rabia Muqaddam\*
*Chief Counsel for Federal Initiatives*
Natasha M. Korgaonkar\*
*Special Counsel*
Zoe Levine\*
*Special Counsel*
Benjamin Liebowitz\*
*Assistant Attorney General*
28 Liberty St. New York, NY 10005
212-416-6557
Natasha.Korgaonkar@ag.ny.gov

*Attorneys for the State of New York*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz\*
*Deputy Solicitor General*
Nora Passamaneck\*
*Senior Assistant Attorney General*
Finnuala K. Tessier\*
*Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Michael M. Tresnowski*
Michael M. Tresnowski\*
*Assistant Attorney General*
Alex Hemmer\*
*Deputy Solicitor General*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Patrick J. Dolan*
Patrick J. Dolan (RI No. 10462)
*Senior Counsel to the Attorney General*
Paul T.J. Meosky (RI No. 10742)
*Special Assistant Attorney General*

Christopher G. Wells*
*Chief of the Public Interest Division*
R. Henry Weaver*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 758-4496
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*

150 South Main Street
Providence, RI 02903
(401) 274-4400
PDolan@riag.ri.gov
PMeosky@riag.ri.gov

*Attorneys for the State of Rhode Island*


**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Joshua G. Nomkin*
Joshua G. Nomkin*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov

*Attorney for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

Michael L. Newman*
*Senior Assistant Attorney General*
Joel Marrero*
*Supervising Deputy Attorney General*
Jesse Basbaum*
Brian Bilford*
Luke Freedman*
Lee I. Sherman*
*Deputy Attorneys General*

By: */s/ Christopher P. Tenorio*
Christopher P. Tenorio*
*Deputy Attorney General*
California Department of Justice
600 W. Broadway, Suite 1800
San Diego, CA 92101 (619) 738-9000
Christopher.Tenorio@doj.ca.gov

*Attorneys for the State of California*


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Mitchell P. Reich*
Mitchell P. Reich*
*Senior Counsel to the Attorney General*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Ashley Meskill*
Ashley Meskill*
Assistant Attorney General
Connecticut Office of the Attorney General

Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorney for the District of Columbia*


165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorney for the State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: /s/ *Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Rose Gibson*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Attorneys for the State of Delaware*


**AARON M. FREY**
Attorney General for the State of Maine

By: /s/ Stanley Abraham
Stanley Abraham*
Assistant Attorney General
Office of the Attorney General
 6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Stanley.Abraham@maine.gov

*Attorney for the State of Maine*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By:  */s/ Michelle R. Pascucci*
Katherine B. Dirks*
Chief State Trial Counsel
Michelle Rita Pascucci*
State Trial Counsel
1 Ashburton Place
Boston, Massachusetts 02108
(617) 963-2255
Katherine.Dirks@mass.gov
Michelle.Pascucci@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

50

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
John Pallas*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PallasJ@michigan.gov

*Attorneys for the State of Michigan*

**AARON D. FORD**
Attorney General for the State of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*

**RAÚL TORREZ**
Attorney General for the State of New
Mexico

By: */s/ Mark Noferi*
Mark Noferi*
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie*
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorney for the State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: */s/ Meghan Musso*
Meghan Musso*
Amanda McElfresh*
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5276
meghan.musso@law.njoag.gov

*Counsel for the State of New Jersey*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000

51

MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorney for the State of Vermont*

Scott.Kennedy@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Benjamin Seel*
Benjamin Seel*
*Assistant Attorney General*
Marsha Chien*
Cristina Sepe*
*Deputy Solicitors General*
Washington State Office
of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Colin T. Roth*
Colin T. Roth*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
colin.roth@wisdoj.gov

*Attorney for the State of Wisconsin*

* Pro hac vice application forthcoming