# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
COLORADO; STATE OF ILLINOIS;
STATE OF RHODE ISLAND; STATE OF
ARIZONA; STATE OF CALIFORNIA;
DISTRICT OF COLUMBIA; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF MAINE; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF
VERMONT; STATE OF WASHINGTON;
STATE OF WISCONSIN,

                *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
JUSTICE; PAMELA J. BONDI, in her
official capacity as Attorney General of the
United States; OFFICE OF JUSTICE
PROGRAMS; MAUREEN HENNEBERG,
in her official capacity as Acting Assistant
Attorney General for the Office of Justice
Programs; OFFICE FOR VICTIMS OF
CRIME; KATHERINE DARKE SCHMITT,
in her official capacity as Acting Director of
the Office for Victims of Crime; BUREAU
OF JUSTICE ASSISTANCE; TAMMIE
GREGG, in her official capacity as Acting
Director of the Bureau of Justice Assistance;
OFFICE ON VIOLENCE AGAINST
WOMEN; GINGER BARAN LYONS, in her
official capacity as Deputy Director for
Grants Development and Management of the
Office on Violence Against Women,

                *Defendants*.

No. 1:25-cv-00499-MRD-AEM

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT................................................................................. 1

BACKGROUND ................................................................................................... 3

   I.   The Department of Justice Has Long Administered Grants for Victim Services and Criminal Justice Without Regard to Immigration Status. ................................. 3

     A.   Victims of Crime Act. ............................................................................. 3

     B.   Violence Against Women Act. ................................................................. 6

     C.   Byrne JAG. ............................................................................................. 8

   II.   DOJ Abruptly Changed Course and Excluded Immigrants from Accessing Crucial Services Through the Legal Services Condition. ...................................... 9

   III.   The Legal Services Condition Will Significantly Harm Plaintiff States and the Programs They Administer. ................................................................... 14

ARGUMENT ........................................................................................................ 17

   I.   Plaintiffs Are Likely to Succeed on the Merits. ........................................... 17

     A.   The Legal Services Condition Violates the Spending Clause. ..................... 18

       1.   The Legal Services Condition Is Impermissibly Retroactive as to Previously Awarded Grants. ....................................................................... 18

       2.   The Legal Services Condition Is Unlawfully Ambiguous as to All Grants. ............. 20

     B.   The Legal Services Condition Is Arbitrary and Capricious. ......................... 22

     C.   The Legal Services Condition Is Contrary to Law as Applied to VOCA's Victim Assistance Program and VAWA Programs. ................................... 27

   II.   Plaintiffs Face Irreparable Harm Absent Temporary Relief. ........................... 28

   III.   The Balance of the Equities and the Public Interest Favor a Preliminary Injunction. ....... 32

CONCLUSION AND RELIEF REQUESTED ........................................................ 34

INDEX OF EXHIBITS........................................................................................ 40

## PRELIMINARY STATEMENT

The law is well-settled that the federal government must provide States "clear notice" of the terms of grants awarded to them and cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). It is equally well-settled that agency decisions must be "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and must be "'in accordance with law,'" *FCC v. NextWave Pers. Commc'ns Inc*., 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). This action seeks to hold Defendants to these fundamental requirements.

Over the last six weeks, Defendants have issued a series of notices (collectively, the "Legal Services Condition") that purport to suddenly block States from using federal grants administered by the Department of Justice ("DOJ") to provide critical legal services to certain non-citizens, including crime victims and witnesses. The Legal Services Condition is contrary to longstanding regulations and guidance and will erode the criminal justice system. Causing further injury, Defendants insist that the Legal Services Condition applies retroactively to grants already awarded, included some awarded years ago.

The Legal Services Condition is unlawful for several reasons. First, it violates the Spending Clause in two ways. The Legal Services Condition is an unlawfully retroactive condition with respect to grants previously awarded. And for all grants, it is unconstitutionally ambiguous because it leaves unanswered (1) what services are at issue, (2) who is to be excluded from those services, and (3) what obligations state agencies (and subgrantees) are required to undertake to identify which persons to exclude.

Second, the Legal Services Condition violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious. Defendants failed to provide any reasoned explanation for

1

their decision or their change in longstanding position, failed to consider substantial reliance interests, failed to explain why this across-the-board policy would be authorized within the statutory scheme applicable to each of the myriad grants at issue, failed to consider important aspects of the problem, including the significant harm that will be imposed on crime victims and public safety, and failed to consider how States can workably implement the provision, particularly in light of its myriad ambiguities.

Third, and specific to the Victims of Crime Act ("VOCA") Victim Assistance and Violence Against Women Act ("VAWA") Formula Grants, the Legal Services Condition is contrary to law because it is in direct conflict with governing statutes and regulations. For example, both VOCA and VAWA regulations provide that eligibility for services "is not dependent on the victim's immigration status," 28 C.F.R. §§ 90.4(c), 94.103(a), 94.116, which is directly contrary to the Legal Services Condition.

In addition to showing a likelihood of success on the merits, Plaintiff States are likely to show irreparable harm in the absence of preliminary relief. The Legal Services Condition forces Plaintiff States to expend substantial resources to immediately modify their long-standing programs to comply with a retroactive and ambiguous funding condition that lacks any guidance as to the new obligations purportedly being imposed. Not only does this cause unrecoverable costs, it also places Plaintiff States at significant risk of enforcement actions, risking the loss of hundreds of millions in funding. The Legal Services Condition also undermines Plaintiff States' sovereign interests in protecting public safety and administering their criminal justice system by deterring crime victims and witnesses from reporting crimes and participating in the criminal justice system. Plaintiff States are entitled to a preliminary injunction and a stay of the challenged actions under 5 U.S.C. § 705.

## BACKGROUND

This lawsuit challenges Defendants' unlawful implementation of the Legal Service Condition placed on DOJ grant programs.

**I.    The Department of Justice Has Long Administered Grants for Victim Services and Criminal Justice Without Regard to Immigration Status.**

DOJ's Office of Justice Programs ("OJP"), through its Office for Victims of Crime ("OVC") and Bureau of Justice Assistance ("BJA"), as well as DOJ's Office on Violence Against Women ("OVW"), oversee various federal grants programs that provide States with resources to support victims, witnesses, and others embroiled in the criminal justice system.

Many of OJP's grant programs for States are formula grants—that is, non-competitive federal grants awarded to States based on strict formulas and criteria set forth by statute, not on DOJ's substantive priorities at a given time. *See City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020). Congress has not conditioned eligibility for DOJ's grant programs on an individual's immigration status, and none of the relevant statutory schemes contain any hint that an individual's eligibility for services funded by the grants would be dependent on such status. This silence is for good reason: our criminal justice systems rely on the willingness of victims and witnesses to come forward to report crimes and cooperate with prosecutors.

As outlined below, OJP and OVW have long administered programs such as VOCA, VAWA, and Byrne JAG without requiring inquiry of an individual's immigration status.

### A.  Victims of Crime Act.

Congress passed VOCA in 1984, creating OVC and the federal Crime Victims Fund to support victim compensation and assistance. 34 U.S.C. §§ 20101–11. Congress structured VOCA "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to

assist victims of crime" in order to support inadequately funded state and local victim assistance programs. S. Rep. No. 98-497, at 1, 3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3607.

OVC administers two formula grant programs pursuant to VOCA: (1) Victim Assistance Formula Grants, and (2) Victim Compensation Formula Grants.

**Victim Assistance Formula Grants** provide funding to each State to provide financial support for eligible crime victim assistance programs. 34 U.S.C. § 20103(a)(1). VOCA directs that the OVC Director "shall make an annual grant" to States based on a fixed statutory formula that largely turns on each State's population. *Id.* §§ 20103(a)(1), (3), (5). Each State then subgrants such funds out to eligible public agencies and community-based organizations that operate victim services programs. *Id.* § 20103(c).

The VOCA regulations specifically provide that "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 94.103(a) (VOCA); 28 CFR § 90.4(c) (VAWA). Direct services for which Victim Assistance funds may be used include services to address victims' "[i]mmediate emotional, psychological, and physical health and safety," including "[e]mergency legal assistance, such as for filing for restraining or protective orders, and obtaining emergency custody orders and visitation rights." 28 C.F.R. § 94.119(a), (a)(10). VOCA funds may also be used for additional legal assistance services "where the need for such services arises as a direct result of the victimization," including (but not limited to) services "that help victims assert their rights as victims in a criminal proceeding directly related to the victimization, or otherwise protect their safety, privacy, or other interests as victims in such a proceeding" and civil actions (other than tort actions) that "are reasonably necessary as a direct result of the victimization." 28 C.F.R. § 94.119(f).

4

In recent years, Victim Assistance Formula Grants have enabled States to provide services to hundreds of thousands of crime victims per year in amounts totaling hundreds of millions of dollars. *See, e.g.,* Ex. 3, California (Hammett Decl.) ¶¶ 7, 11; Ex. 8, Illinois (Hailey Decl.) ¶¶ 6–9; Ex. 13, Michigan (Nagel Decl.) ¶ 6; Ex. 17, New York (Williams Decl.) ¶ 6. These funds support, among other things, legal services related to asserting victims' rights in criminal proceedings; legal advice in financial proceedings, such as advice with creditors; consumer rights representation; family court proceedings including divorce and custody litigation; guardianship; landlord/tenant advocacy and litigation; employment advocacy; Title IX advocacy and litigation; and public benefits litigation. *See, e.g.*, Ex. 2, Arizona (Coleman Decl.) ¶ 10; Ex. 3, California (Hammett Decl.) ¶ 19; Ex. 10, Maine (Johnson Decl.) ¶ 14; Ex. 13, Michigan (Nagel Decl.) ¶ 12; Ex. 23, Wisconsin (Phelps Decl.) ¶ 13. Plaintiff States have administered these programs without consideration of immigration status. *See, e.g.*, Ex. 3, California (Hammett Decl.) ¶ 14; Ex. 8, Illinois (Hailey Decl.) ¶ 12; Ex. 13, Michigan (Nagel Decl.) ¶ 10.

**Victim Compensation Formula Grants** provide funding to all eligible state-run crime victim compensation programs. 34 U.S.C. § 20102. VOCA directs that the OVC Director "shall make an annual grant" to eligible programs based on a fixed statutory formula that considers the amount of crime victim compensation that each program was awarded in the preceding fiscal year. *Id.* § 20102(a)(1). As with Victim Assistance, Congress specified eligibility criteria for state-run compensation programs, requiring, for example, that states pay for certain victim expenses, treat federal and state crimes and residents and non-residents the same, and not deny compensation based on a victim's familial relationship with an offender. *Id.* § 20102(b). Congress further provided that states use their crime victim compensation programs to "offer[] compensation to victims and survivors of victims of criminal violence, including drunk driving and domestic

5

violence," by paying medical and funeral expenses, loss of wages, and other costs resulting from certain crimes. *See id.* § 20102(b)(1).

In recent years, Victim Compensation grants have enabled States to provide compensation for services to hundreds of thousands of crime victims per year in amounts totaling millions of dollars. Ex. 5, Connecticut (Pelka Decl.) ¶ 7; Ex. 12, Massachusetts (Lowney Decl.) ¶ 7; Ex. 13, Michigan (Nagel Decl.) ¶¶ 15–16. These funds support, among other things, legal services related to victimization that are not funded through other sources, including legal fees and costs connected to the pursuit of protective orders, court attendance, records expungement, fees incurred to establish one's victim status, and other legal assistance. *See* Ex. 5, Connecticut (Pelka Decl.) ¶ 17; Ex. 15, New Jersey (Teffenhart Decl.) ¶ 15; Ex. 17, New York (Williams Decl.) ¶ 19. Plaintiff States have administered these programs without consideration of immigration status. Ex. 5, Connecticut (Pelka Decl.) ¶ 17; Ex. 12, Massachusetts (Lowney Decl.) ¶ 17; Ex. 17, New York (Williams Decl.) ¶ 19.

## B.  Violence Against Women Act.

With broad bipartisan support, Congress enacted VAWA in 1994 to address the inadequacy of government responses to incidents of domestic violence. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 40121, 108 Stat. 1796, 1910–16 (codified as amended at 34 U.S.C. § 10446). Members of Congress understood that domestic violence was not only a problem within families, but also presented a threat to public safety, endangering the lives of the victims, their family members, and community members. *See, e.g.*, 141 Cong. Rec. 20519 (1995) (Statement of Rep. Schroeder) ("[D]omestic violence is not just a private matter anymore; these private dramas are spilling out into public places, endangering family members and strangers."). And by enacting VAWA, Congress recognized that existing infrastructure did not adequately respond to domestic violence incidents and provide necessary services to survivors.

Among the early VAWA funding initiatives was the STOP (Services, Training, Officers, and Prosecutors) Formula Grant, which is awarded to states and territories to, among other things, develop and strengthen victim services in cases involving violent crimes against women. The Sexual Assault Services Formula Grant Program ("SASP"), meanwhile, is awarded to states and territories to support rape crisis centers and other nonprofit, nongovernmental organizations that provide services to victims of sexual assault and their families. For both STOP and SASP grants, each state and territory must allocate at least 30 percent of their STOP award for victim services, of which at least 10 percent must be distributed to culturally specific, community-based organizations. 34 U.S.C. § 10446(c)(4)(C).

Victim services supported by STOP and SASP grants may include "legal assistance," defined to include proceedings related to divorce, parental rights, employment, housing, education, civil rights, immigration, criminal justice, and more. 34 U.S.C. §§ 10441(b)(5), 12291(a)(46). Moreover, Congress expressly authorized funds for legal services aimed at "underserved populations," that is, those "populations who face barriers in accessing and using victim services," including because of their "alienage status." *Id*. §§ 10441(b)(5), 12291(a)(46). And Congress expressly authorized the use of VAWA funds to "provid[e] assistance to victims of domestic violence and sexual assault in immigration matters." 34 U.S.C. § 10441(b)(10).

In recent years, STOP and SASP grants have enabled States to provide compensation for services to thousands of crime victims per year totaling millions of dollars. Ex. 3, California (Hammett Decl.) ¶¶ 12–13; Ex. 4, Colorado (Lunn Decl.) ¶¶ 12–13, 17–18; Ex. 18, New York (Schaefer Decl.) ¶¶ 6, 13. Plaintiff States use STOP and SASP awards to fund many of the same legal services for victims that are funded by VOCA grants, including court accompaniment and legal advocacy for protective orders and child support. Ex. 3, California (Hammett Decl.) ¶¶ 12,

20; Ex. 4, Colorado (Lunn Decl.) ¶¶ 25–26; Ex. 18, New York (Schaeffer Decl.) ¶¶ 8, 15. And as with VOCA Victim Assistance funds, Plaintiff States have administered their STOP and SASP programs without consideration of immigration status. Ex. 3, California (Hammett Decl.) ¶ 14; Ex. 4, Colorado (Lunn Decl.) ¶ 19; Ex. 18, New York (Schaefer Decl.) ¶ 23.

### C.  Byrne JAG.

Byrne JAG is a formula grant program, administered by BJA, that provides federal funding for criminal justice programming at the State and local level, as well as to territories, tribes, and governmental agencies. The program is named after the late Officer Edward Byrne, a young New York City police officer who was felled in the line of duty while protecting an immigrant witness. Joseph P. Fried, *Officer Guarding Drug Witness is Slain*, N.Y. Times, Feb. 27, 1988, at A1. 46.

Byrne JAG was designed to "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). One area to which States may allocate Byrne JAG funds is to "prosecution and court programs," which include public defender's offices. 34 U.S.C. § 1052(a)(1)(B). Some Plaintiff States use Byrne JAG funding to fill gaps in their criminal justice system, where staffing shortages create delays in criminal proceedings.

In reliance on the Byrne JAG statute and other guidance from BJA, some Plaintiff States have allocated federal funding to public defender's offices at the county level. These offices fill a crucial need within the State and local criminal justice system to prevent case backlogs and ensure efficient court proceedings. For example, Illinois identified support for public defense services as one of the priorities for its Byrne JAG programming, after extensive meetings with Illinois criminal justice stakeholders revealed a lack of public defense staff could hinder the entire criminal justice process. Ex. 7, Illinois (Hadley Decl.) ¶¶ 10–11. A study of indigent defense in Illinois revealed

recipients of appointed counsel were required to wait several days and even weeks to speak with appointed counsel. *Id.* ¶ 11.

Other Plaintiff States use Byrne JAG funding to support victim services. Washington, for example, has used Byrne JAG funding to increase the capacity of subgrantees to provide culturally specific legal assistance to survivors of domestic and sexual violence in order to close the "justice gap" these crime victims often experience when critical legal intervention is needed, as well as to increase the availability of survivor-centered, pre-diversion and conviction relief programs. Ex. 22, Washington (Guertin-Anderson Decl.) ¶ 14.

These States have never been required to limit the scope of services funded by Byrne JAG based on immigration status, nor would such a limitation align with Byrne JAG's goal of improving the overall operation of the criminal justice system at the State and local level. In Oregon, for example, Byrne JAG funds are used to support free drop-in legal services on the nine federally recognized Oregon tribal reservations and six other rural locations. Ex. 19, Oregon (Keck Decl.) ¶¶ 6–7. Requiring documentation from clients to verify eligibility for legal services would be a significant impediment to the drop-in legal services model because people may not have access to documentation to prove citizenship or immigration status or may be unlikely to bring such documentation with them. *Id.*; Ex. 8, Illinois (Hadley Decl.) ¶ 14; Ex. 23, Washington (Guertin-Anderson Decl.) ¶¶ 15–16.

## II. DOJ Abruptly Changed Course and Excluded Immigrants from Accessing Crucial Services Through the Legal Services Condition.

In the almost half-century that Congress has guaranteed federal funding for state programs that provide legal services for crime victims and other criminal justice programming, the Executive has never before conditioned the use of funds on immigration status. To the contrary, VAWA expressly contemplates provision of legal services—including assistance in "immigration

matters"—to noncitizens, including individuals who "who face barriers in accessing and using victim services" because of their "alienage status." 34 U.S.C. §§ 10441(b)(5), (b)(10), 12291(a)(46); *see also* Violence Against Women Act of 1994, Pub. L. No. 103-322, § 40701, 108 Stat. at 1953–1955 (creating immigration protections for noncitizen survivors, allowing them to petition for legal status independent of abusive spouses). And for both VAWA STOP and SASP grants and VOCA Victim Assistance, regulations expressly prohibit states from conditioning services on immigration status. *See* 28 C.F.R. §§ 90.4(c), 94.103(a) (eligibility under VOCA for victims of crimes and under VAWA for survivors of sexual assault and domestic violence "is not dependent on the victim's immigration status."). Nor do the grant awards Plaintiff States have received include any conditions on providing services to individuals based on their immigration status. Ex. 2, Arizona (Coleman Decl.) ¶¶ 12, 13; Ex. 4, Colorado (Lunn Decl.) ¶ 19; Ex. 7, Illinois (Hadley Decl.) ¶ 14; Ex. 10, Maine (Johnson Decl.) ¶ 21; Ex. 12, Massachusetts (Lowney Decl.) ¶ 11; Ex. 13, Michigan (Nagel Decl.) ¶ 33; Ex. 17, New York (Williams Decl.) ¶¶ 19, 28; Ex. 18, New York (Schaefer Decl.) ¶¶ 22–23; Ex. 23, Wisconsin (Phelps Decl.) ¶ 20; Ex. 24, Massachusetts (Stanton Decl.) ¶ 15.

Despite this long history of not tying funding to immigration status, starting on or about August 18, 2025, Defendants sent Plaintiff States a series of notices announcing the Legal Services Condition, significantly changing the landscape for DOJ grant programs that support the criminal justice system and victims and witnesses of crimes. Specifically, Defendants unilaterally announced that, for all open VOCA and Byrne JAG grants:

> Effective immediately upon receipt of this notice, any obligations of funds, at any tier, under this award to provide (or to support the provision of) legal services to any removable alien or any alien otherwise unlawfully present in the United States shall be unallowable costs for purposes of this award, but the foregoing shall not be understood to apply—(1) to legal services to obtain protection orders for victims of crime; or (2) to immigration-related

> legal services that may be expressly authorized or required by any law, or any judicial ruling, governing or applicable to the award.

Ex. 4, Colorado (Lunn Decl.) ¶ 27, Attachment 1; *see also* Ex. 2, Arizona (Coleman Decl.) ¶ 11; Ex. 5, Connecticut (Pelka Decl.) ¶ 19; Ex. 7, Illinois (Hadley Decl.) ¶ 15; Ex 10, Maine (Johnson Decl.) ¶ 16; Ex. 13, Michigan (Nagel Decl.) ¶ 27; Ex. 22, Washington (Guertin-Anderson Decl.) ¶ 19.

On or about September 15, 2025, Defendants sent a superseding notice by email, providing as follows (the "September 15 notice"):

> The notice entitled "Notice Regarding Unallowable Costs Under the Award" that was sent on August 18, 2025 (which this notice supersedes), will be implemented as specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs" ("Legal Services for Aliens"). As provided in the award itself, compliance with the DOJ Grants Financial Guide is a material requirement of the award. The award requirement specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs" ("Legal Services for Aliens") will be effective – and will be subject to enforcement under this Federal grant award from the Department of Justice – starting on October 31, 2025.[1]

Ex. 4, Colorado (Lunn Decl.) ¶ 30, Attachment 2; *see also* Ex. 2, Arizona (Coleman Decl.) ¶ 14; Ex. 3, California (Hammett Decl.) ¶ 23; Ex. 5, Connecticut (Pelka Decl.) ¶ 21; Ex. 6, Delaware (Kervick Decl.) ¶ 16; Ex. 7, Illinois (Hadley Decl.) ¶ 17; Ex. 8, Illinois (Hailey Decl.) ¶ 37; Ex. 10, Maine (Johnson Decl.) ¶ 18; Ex. 11, Maryland (Lennig Decl.) ¶ 33; Ex. 12, Massachusetts (Lowney Decl.) ¶ 21; Ex. 13, Michigan (Nagel Decl.) ¶ 29; Ex. 14, Minnesota (Babine Decl.) ¶ 15; Ex. 15, New Jersey (Teffenhart Decl.) ¶ 25; Ex. 16, New Mexico (Zubia Decl.) ¶ 29; Ex. 17, New York (Williams Decl.) ¶ 23; Ex. 21, Vermont (Poehlmann Decl.) ¶ 20; Ex. 22, Washington

---

[1] In connection with this litigation, counsel for Defendants had agreed to postpone enforcement of the Legal Services Condition until October 31, 2025 to allow for briefing this motion.

(Guertin-Anderson Decl.) ⁋ 21; Ex. 23, Wisconsin (Phelps Decl.) ⁋ 18; Ex. 25, Oregon (Sivell) ⁋ 16.

Concurrently with sending the September 15 notice, Defendants inserted in the "DOJ Grants Financial Guide," new language articulating the full scope of the "unallowable costs" limitation for "Legal Services for Aliens," which provides as follows (the "Legal Services Condition"):

> Except as indicated in the following sentence, costs of providing legal services (that is, professional services of the kind lawfully provided only by individuals licensed to practice law) to any removable alien (*see* 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States are disallowed and may not be charged against the award.
>
> Costs for legal services disallowed under the preceding sentence do not include costs for legal services— (1) to obtain protection orders for victims of crime (including associated or related orders (e.g., custody orders), arising from the victimization); (2) that are associated with or relate to actions under 18 U.S.C. ch. 77 (peonage, slavery, and trafficking in persons); (3) to obtain T-visas, U-visas, or "continued presence" immigration status (*see, e.g.*, 8 U.S.C. § 1101(a)(15)(T) & (U); 22 U.S.C. § 7105(c)(3)(A)); or (4) as to which such disallowance would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

*See* Ex. 1, Unallowable Costs, Section 3.13, DOJ Grants Financial Guide 2024, at 07; *see also* Ex. 2, Arizona (Coleman Decl.) ⁋ 15; Ex. 12, Massachusetts (Lowney Decl.) ⁋ 22; Ex. 13, Michigan (Nagel Decl.) ⁋ 30; Ex. 22, Washington (Guertin-Anderson Decl.) ⁋⁋ 22.

By implementing the Legal Services Condition through the DOJ Grants Financial Guide, Defendants have seemingly applied this condition across-the-board to DOJ grants, as all DOJ grants require compliance with the DOJ Grants Financial Guide. For example, on or about September 17, 2025, Plaintiffs States received their VOCA Fiscal Year 2025 Pre-Acceptance Award Packages with a condition that states: "The recipient agrees to comply with the DOJ Grants Financial Guide." Ex. 4, Colorado (Lunn Decl.) ⁋ 32; Ex. 5, Connecticut (Pelka Decl.) ⁋ 23; Ex. 17,

New York (Williams Decl.) ⁋ 25. The VAWA award packages received on or about August 18, 2025 contain similar language. *See, e.g.*, Ex. 4, Colorado (Lunn Decl.) ⁋ 29; Ex. 24, Massachusetts (Stanton Decl.) ⁋⁋ 10–11; Ex. 26, Nevada (Hoban Decl.) ⁋⁋ 17–18. Further emphasizing that this change applies across-the-board, on September 30, 2025, DOJ sent grantees a notification that "[t]he Department of Justice has updated the DOJ Grants Financial Guide, which serves as the primary reference manual for Office of Justice Programs (OJP), Office on Violence Against Women (OVW), and Office of Community Oriented Policing Services (COPS Office) award recipients." Ex. 4, Colorado (Lunn Decl.) ⁋ 33, Attachment 3. The notification listed, among the amendments, the Legal Services Condition, indicating that the change had been made in September 2025. *Id*.

The Legal Services Condition applies to both Plaintiff States as direct grantee and as pass-through entities that provide subawards to subrecipients (also known as "subgrantees"). Examples of subrecipients include local government entities and community-based organizations that contribute to the objectives of the federal award. As pass-through entities, Plaintiff States are required, by federal regulation and by the DOJ Guide, to "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward." *See* 2 C.F.R. § 200.332(e); Ex. 1, DOJ Grants Financial Guide Sec. 3.14 at 10–15. These monitoring obligations include conducting audits for certain subgrantees, reviewing financial and performance reports, reviewing financial operations and activities, ensuring corrective actions are taken when needed, and other related measures. *See* 2 C.F.R. § 200.332(e); Ex. 1, DOJ Grants Financial Guide Sec. 3.14 at 12–14. The Guide also provides: "Where the conduct of a program or one of its components is delegated to a subrecipient,

the direct recipient is responsible for all aspects of the program including proper accounting and financial recordkeeping by the subrecipient." *Id.* at 15.

The Legal Services Condition leaves open a number of significant questions regarding both its scope and application. For example, the Legal Services Condition does not specify what services are now disallowed or when "such disallowance would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award," as the Legal Services Condition recites. Ex. 1, DOJ Grants Financial Guide Sec. 3.13 at 7. As another example, there is a question as to whether the Legal Services Condition is intended only to prohibit Plaintiff States and subgrantees from requesting reimbursement for legal services to individuals whom they *know* to be undocumented immigrants or whether Defendants intend to impose an *affirmative obligation* on Plaintiff States and subgrantees to ascertain the immigration status of all recipients of funded services, despite the fact that Plaintiff States and subgrantees have no current mechanism to confirm the immigration status of potential claimants and such a requirement could deter victims or witnesses, regardless of immigration status, from accessing services despite their dire need.

## III.    The Legal Services Condition Will Significantly Harm Plaintiff States and the Programs They Administer.

The Legal Services Condition, with both its ambiguities and sudden retroactive change, causes significant harm to Plaintiff States. Each year, Plaintiff States have relied on the terms of the grant programs, including that they are open to everyone and not restricted to individuals based on immigration status. As a result, in making past subgrantee awards, Plaintiff States did not consider that certain types of services (in this case, certain legal services) would later be disallowed for certain types of victims and witnesses (in this case, "any removable alien or any alien otherwise unlawfully present in the United States"). Ex. 2, Arizona (Coleman Decl.) ¶ 17; Ex. 3, California

(Hammett Decl.) ¶ 27; Ex. 4, Colorado (Lunn Decl.) ¶ 35; Ex. 5, Connecticut (Pelka Decl.) ¶ 25; Ex. 6, Delaware (Kervick Decl.) ¶ 20; Ex. 7, Illinois (Hadley Decl.) ¶¶ 20–21; Ex. 8, Illinois (Hailey Decl.) ¶ 42–43; Ex. 9, Maine (Gorneau Decl.) ¶ 17; Ex. 10, Maine (Johnson Decl.) ¶ 23; Ex. 11, Maryland (Lennig Decl.) ¶ 37; Ex. 12, Massachusetts (Lowney Decl.) ¶ 25; Ex. 13, Michigan (Nagel Decl.) ¶ 35; Ex. 14, Minnesota (Babine Decl.) ¶ 19; Ex. 15, New Jersey (Teffenhart Decl.) ¶ 30; Ex. 16, New Mexico (Zubia Decl.) ¶ 34; Ex. 17, New York (Williams Decl.) ¶ 28; Ex. 18, New York (Schaefer Decl.) ¶¶ 22–23; Ex. 19, Oregon (Keck Decl.) ¶ 7; Ex. 20, Rhode Island (Hogan Decl.) ¶ 16; Ex. 21, Vermont (Poehlmann Decl.) ¶ 25; Ex. 22, Washington (Guertin-Anderson Decl.) ¶ 25; Ex. 23, Wisconsin (Phelps Decl.) ¶ 22.

And to the extent the Legal Services Condition now requires any inquiry into immigration status before services are provided and/or any monitoring of subgrantees by states, *see* 28 C.F.R. § 200.332(e), Plaintiff States face significant administrative burdens where Defendants do not provide any guidance on monitoring and Plaintiff States do not currently have any specific mechanism in place. Ex. 2, Arizona (Coleman Decl.) ¶¶ 17–21; Ex. 3, California (Hammett Decl.) ¶¶ 27–35; Ex. 5, Connecticut (Pelka Decl.) ¶¶ 30–32, Ex. 6, Delaware (Kervick Decl.) ¶¶ 22–24; Ex. 7, Illinois (Hadley Decl.) ¶¶ 22–25; Ex. 10, Maine (Johnson Decl.) ¶¶ 26–28; Ex. 12, Massachusetts (Lowney Decl.) ¶¶ 24–31; Ex. 13, Michigan (Nagel Decl.) ¶¶ 37–39; Ex. 14, Minnesota (Babine Decl.) ¶¶ 22–24; Ex. 17, New York (Williams Decl.) ¶¶ 31–33; Ex. 19, Oregon (Keck Decl.) ¶ 7; Ex. 22, Washington (Guertin-Anderson Decl.) ¶¶ 27–28; Ex. 23, Wisconsin (Phelps Decl.) ¶¶ 25–27.

This burden is amplified given the number of grants, the amount of funds at issue, the manner in which they are administered, and the retroactive nature of the Legal Services Condition. The period for awarded grants can be years—the "award period" for both VOCA and Byrne JAG

includes the given year's grant plus the three years subsequent, and with the opportunity for extension. 34 U.S.C. §§ 10152(f), 20101(e). As a result, the Legal Services Condition applies to funds that have already been allocated and are actively being spent down by Plaintiff States and subgrantees. Ex. 2, Arizona (Coleman Decl.) ⁋⁋ 12–13, 16; Ex. 5, Connecticut (Pelka Decl.) ⁋ 24; Ex. 10, Maine (Johnson Decl.) ⁋ 21; Ex. 22, Washington (Guertin-Anderson Decl.) ⁋ 24. Plaintiff States receive these grants every year, still have hundreds of millions of dollars in grant funds to spend down, and have never considered that certain types of services would be disallowed for certain types of victims. *See supra* §§ I(a)–(c). It would be especially difficult for subgrantees, most of whom are resource-limited, non-profit, community-based organizations to develop new practices. Ex. 3, California (Hammett Decl.) ⁋ 28; Ex. 11, Maryland (Lennig Decl.) ⁋ 38; Ex. 13, Michigan (Nagel Decl.) ⁋ 36.

Finally, beyond these administrative questions, Plaintiff States expect that the Legal Services Condition will discourage individuals from seeking services, resulting in severe consequences. Especially in the case of survivors of domestic violence, cutting off victims' access to important legal documents is a common coercive and abusive tactic such that victims may not be able prove that they have lawful status. Ex. 11, Maryland (Lennig Decl.) ⁋ 39; Ex. 12, Massachusetts (Lowney Decl.) ⁋ 27. Excluding all individuals who cannot prove their immigration status would punish not only undocumented survivors but would also punish victims who simply do not have access to the requisite documentation or are scared that their documentation is inadequate and decide not to come forward. And more broadly, when victims or witnesses are afraid that reporting a crime (or seeking related services/support) could result in adverse immigration consequences for them or their families, it is both harmful for them personally and a detriment to public safety generally. Providing criminal justice and victim services without regard

to immigration status ensures that all people are provided critical services, and that victims and witnesses will come forward without fear of potential deportation. The trust that Plaintiff States and their subgrantees have built over years of providing services as well as the public good of participation in the criminal justice system will be irreparably harmed if services are selectively withheld and/or if victim must provide evidence of citizenship in order to receive assistance. Ex. 3, California (Hammett Decl.) ¶¶ 34–36; Ex. 5, Connecticut (Pelka Decl.) ¶¶ 35–36; Ex. 13, Michigan (Nagel Decl.) ¶ 42; Ex. 23, Wisconsin (Phelps Decl.) ¶¶ 30–31.

## ARGUMENT

Plaintiff States have satisfied each of the elements for issuance of a preliminary injunction. Under that standard, "[t]he district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, each of these factors tips decisively in Plaintiffs' favor.

## I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims. *First*, the Legal Services Condition violates the Spending Clause; for previously awarded grants, it constitutes an impermissible retroactive condition, and for all grants, it is unconstitutionally ambiguous. *Second*, the Legal Services Condition is arbitrary and capricious because it was issued without any reasoning or explanation that accounts for the different statutory schema to which it applies or States' reliance interests and harms imposed on Plaintiff States. *Third*, the Legal Services

Condition as applied to VOCA's Victim Assistance program and to VAWA grants is contrary to law as it contradicts statutory authority and/or regulations stating that eligibility for services does not depend on immigration status.

### A. The Legal Services Condition Violates the Spending Clause.

The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Under this Clause, Congress may "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207. As the Supreme Court has repeatedly held, the Spending Clause requires the federal government to both provide States "clear notice" of the terms of their grants, and not "surprise[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25; *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–78 (2012) (contrasting between when Congress gives states have a "legitimate choice" versus no choice). These requirements ensure that States have an opportunity to "knowingly decide whether or not to accept those funds." *Pennhurst*, 451 U.S. at 25. These requirements not only constrain Congress when it enacts spending legislation, *id.*, but they also apply to federal agencies when adopting or enforcing spending conditions. *See, e.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019) (holding that an agency rule violated the Spending Clause); *New York v. DOJ*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *20 (D.R.I. Sep. 10, 2025) (same).

### 1. The Legal Services Condition Is Impermissibly Retroactive as to Previously Awarded Grants.

The Legal Services Condition is impermissibly retroactive because it applies to funds that Plaintiff States were previously awarded, often long ago.

The Legal Services Condition, as applied through the September 15 notice, states that it "will be effective – and will be subject to enforcement under this Federal grant award from the Department of Justice – starting on October 31, 2025." Indeed, this September 15 notice was sent only with respect to grant awards that were previously issued. In other words, starting October 31, 2025, all open awards—i.e., awards Plaintiffs States have received and are still drawing down— will need to comply with the Legal Services Condition.

Plaintiff States' awards that they are still spending down go back years. For example, under VOCA, the "award period" of a given year's grant is that year plus the three years subsequent. 34 U.S.C. § 20101(e). Even at the end of that four-year period, States are often granted further extensions. Similarly, Byrne JAG has a four-year period of performance, with the opportunity for an extension. 34 U.S.C. § 10152(f). As a result, the Legal Services Condition imposes the new policy retroactively on awarded grants, often years after they were applied for and granted, and years after States made subgrantee awards based on the terms of the awards at the time they were made. Ex. 2, Arizona (Coleman Decl.) ¶¶ 12–13, 16; Ex. 10, Maine (Johnson Decl.) ¶ 21; Ex. 12, Massachusetts (Lowney Decl.) ¶ 23.

This reaching back to apply the Legal Services Condition to funds already awarded is the epitome of unlawful, retroactive notice. The federal government may not "surpris[e] participating States with post acceptance or 'retroactive' conditions" on Federal grants. *Pennhurst*, 451 U.S. at 25. And by its very terms, the Legal Services Condition amounts to a retroactive condition on the States that they were wholly "unable to ascertain" at the time they accepted the relevant grants. *Arlington Cent. School Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also New York v. DOJ*, 2025 WL 2618023, at *20 (finding that PWRORA notices violated the Spending Clause as unlawfully retroactive). Indeed, the reason that Defendants sent the notice for prior years'

awards was because Defendants were adding a new retroactive condition that plainly did not exist for those awards.

In sum, the Legal Services Condition, as applied to previously awarded grants, is retroactive and therefore unconstitutional under the Spending Clause.

### 2. The Legal Services Condition Is Unlawfully Ambiguous as to All Grants.

As to all grants, the Legal Services Condition is unconstitutionally ambiguous. The Legal Services Condition is hopelessly ambiguous as to (1) what services are at issue, (2) who is excluded from those services, and (3) what obligations state agencies (and subgrantees) are required to undertake to identify which persons to exclude. *See Arlington*, 548 U.S. at 296 (explaining that Spending Clause ambiguity is viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the funds] and the obligations that go with those funds").

First, State agencies lack clarity as to what services are disallowed. The Legal Services Condition, in its latest form, now exempts any legal services "as to which such disallowance would contravene any express requirement of any law." Does that mean any state or federal law? Does it include regulatory law? What constitutes an express requirement? The Legal Services Condition does not provide answers. For example, many state laws preclude state employees from inquiring as to immigration status. *See, e.g.*, Ex. 4, Colorado (Lunn Decl.) ⁋ 20; Ex. 11, Maryland (Lennig Decl.) ⁋ 24; Ex. 17, New York (Williams Decl.) ⁋ 13; *see also* Colo. Rev. Stat. § 24-74-104; Md. Code Ann. Crim. Proc. § 5-104; Or. Rev. Stat. 181A.823(1)(b). As a result, it is ambiguous whether Plaintiffs should understand that the Legal Services Condition does not apply in states with such laws, notwithstanding Defendants' express notice stating that it applies to those grants. As another example, both VOCA Victim Assistance and VAWA Formula Grants regulations provide that

eligibility for services "is not dependent on the victim's immigration status." 28 C.F.R. §§ 90.4(c), 94.103(a), 94.116. Again, it is ambiguous whether Plaintiff States should follow the regulations or the Legal Services Condition.

Other portions of the Legal Services Condition are equally unclear. The Legal Services Condition now excludes from disallowed costs not just services "to obtain protection orders for victims of crime," but also "associated or related orders (e.g., custody orders), arising from the victimization)." Defendants have not explained what constitutes an "associated or related order." Does the Legal Services Condition apply to, for example, services for custody orders that arise from victimization if the victim has not sought a protective order because the offender is incarcerated? Or should the Legal Services Condition be read to allow reimbursement for any legal services "arising from the victimization"—another exception that would swallow the entire provision, at least as it relates to VOCA and VAWA programs?

Second, it is also unclear who constitutes an "alien" subject to the Legal Services Condition. According to the DOJ Grants Financial Guide, the Legal Services Condition applies not only to removable aliens under 8 U.S.C. § 1229a(e)(2) but also to aliens who are "otherwise unlawfully present," a term that is nowhere defined. Moreover, the inclusion of the term "otherwise" implies that "removable aliens" are "unlawfully present." But Section 1229a(e)(2) includes as "removable" aliens individuals who are lawfully present in the United States but who are deportable under 8 U.S.C. § 1227, including legal permanent residents in certain circumstances. Does the Legal Services Condition apply to individuals who are lawfully present but are removable under Section 1227?

Finally, it is unclear whether and how Plaintiff States are to "[e]valuate and monitor the recipient's or subrecipient's compliance with statutes, regulations, and the terms and conditions of

Federal awards," including the Legal Services Condition. *See* 2 C.F.R. § 200.303. As an initial matter, for VOCA Victim Assistance and VAWA awards, it is impossible to ensure compliance with both program regulations and the Legal Services Condition, as they squarely conflict. *See supra* 2. But even without conflicting regulations, it is unclear how Plaintiff States are to monitor compliance with the Legal Services Condition. For example, are Plaintiff States and/or subgrantees under an obligation to determine immigration status before providing services? Must victims affirmatively prove immigration status before receiving services? Who will make the determination whether an individual is a removable alien and what evidence is required? If an affirmative burden, how does DOJ expect the States, which lack expertise in the complexity of immigration status determinations, to monitor subgrantees' compliance with this condition? Needless to say, the Legal Services Condition is not supported by any structure or process for making this assessment.

Because the Legal Services Condition is unlawfully ambiguous, the Spending Clause bars Defendants from demanding compliance with its terms.

### B.  The Legal Services Condition Is Arbitrary and Capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is a "fundamental requirement of administrative law" that an agency "set forth its reasons for decision," *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted), so that its decision is "reasonable and reasonably explained," *Prometheus Radio Project*, 592 U.S. at 423. Agencies must explain their reasoning not only to be "accountable to the public," but also so that their actions are "subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)); *see also Rhode Island v. Trump*, 781 F.

Supp. 3d 25, 46–47 (D.R.I. 2025). Moreover, a federal agency must account for any reliance interests affected by its decision and also any costs of its decision. *See Regents*, 591 U.S. at 30; *Michigan v. EPA.*, 576 U.S. 743, 753 (2015); *State Farm*, 463 U.S. at 43.

The Legal Services Condition is arbitrary and capricious several times over. First, in imposing the Legal Services Condition, Defendants failed to provide any reasoning at all. Specifically, Defendants offered no explanation for why they were suddenly declaring that funds "to provide (or to support the provision of) legal services to any removable alien or any alien otherwise unlawfully present in the United States shall be unallowable costs." Some explanation is needed. *See Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004) (holding a conclusion supported "with *no* explanation" is the epitome of "arbitrary and capricious" decision making (emphasis in original)); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *State Farm*, 463 U.S. at 43 (reasoned explanation must include a "rational connection between the facts found and the choice made" (citation omitted)). Indeed, Defendants were unable to even provide any statutory or regulatory basis for this across-the-board unallowable cost, which stands in stark contrast to other unallowable costs in the DOJ Financial Guide. *See, e.g.*, Ex. 1, DOJ Grants Financial Guide, at 5–8 (outlining and explaining various unallowable costs).

Second, the Legal Services Condition was a change from longstanding position. Accordingly, Defendants were required to display awareness of that change and show that there are good reasons for the change. *See* 28 C.F.R. § 94.103; 28 C.F.R. § 90.4(c); *see also* 81 Fed. Reg. 44528 (July 8, 2016); 81 Fed. Reg. 85891 (Nov. 29, 2016). "[T]he requirement that an agency

provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio.*" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). "And of course the agency must show that there are good reasons for the new policy." *Id.*; *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("[s]udden and unexplained change" may be arbitrary and capricious). Here, Defendants failed to acknowledge the sudden change in position and failed to explain their reasons for the new policy.

Third, by incorporating the Legal Services Condition into the DOJ Grants Financial Guide, Defendants have apparently decided to apply the Legal Services Condition across-the-board to all DOJ grants, as all DOJ grants require compliance with the DOJ Grants Financial Guide. But Defendants have not explained why it is appropriate to impose an across-the-board condition on all grants without regard to whether such condition is authorized under each of the myriad differing statutory schema governing the dozens of different DOJ grant programs.

As a general matter, whether an agency decision is adequately reasoned necessarily "turns on what a relevant substantive statute makes important." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (internal quotation marks omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). It is thus arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020). This principle is particularly true in the grant context, given that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst*, 451 U.S. at 17; *see also, e.g.*, *City of Providence*, 954 F.3d at 31 (concluding that DOJ lacked statutory authority to impose immigration enforcement conditions on Byrne JAG grants). An agency simply cannot

impose grant conditions without first ensuring that the relevant statute supports them. *See New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. 2025) (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority"), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

Here, Defendants' blanket imposition of the Legal Services Condition on DOJ-administered grants reflects no effort to consider whether the Legal Services Condition is permissible in light of any of the many statutes applicable to DOJ grants. In other cases, the United States has correctly conceded that "the degree of agency discretion in implementing grant programs varies depending on the type of grant program and the terms of the authorizing legislation." Opposition/Response to Motion for Preliminary Injunction at 20, *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-01350 (N.D. Cal. Mar. 31, 2025), Dkt. No. 93. But that is exactly what DOJ has ignored here. Its decision to impose a one-size-fits-all funding condition without regard for the underlying authorizing statutes was "arbitrarily broad." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 949–50 (D.C. Cir. 2024); *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (rejecting agency's "one-size-fits-all sledgehammer"); *see also Illinois v. FEMA*, No. CV 25-206 WES, 2025 WL 2716277, at *12 (D.R.I. Sep. 24, 2025) ("The indiscriminate application of these conditions across the entire spectrum of DHS-administered grants demonstrates the absence of tailoring and the failure to consider whether such conditions are appropriate for particular programs.").

Fourth, and relatedly, the Legal Services Condition is arbitrary and capricious because Defendants "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. In particular, Defendants failed to consider the harmful effects from the Legal Services Condition and how it undermines some of the core purposes of particular grants. For example,

inquiring about immigration status and limiting services based on that status will cause fewer victims and witnesses to come forward, undermining the justice system and a core purpose of VOCA and VAWA. Ex. 6, Delaware (Kervick Decl.) ⁋ 11; Ex. 12, Massachusetts (Lowney Decl.) ⁋ 14; Ex. 13, Michigan (Nagel Decl.) ⁋ 11. Similarly, these limitations on the use of Byrne JAG funding will undermine access to necessary legal services and will result in substantial waste and impediments to State attempts to create more efficient court proceedings. Ex. 7, Illinois (Hadley Decl.) ⁋⁋ 23–24; Ex. 19, Oregon (Keck Decl) ⁋⁋ 6–7. And if an affirmative requirement, Defendants also failed to consider how Plaintiff States and subgrantees, who lack expertise in immigration law, are expected to comply with a condition that turns on the complexities of immigration law without any guidance from DOJ. Ex. 6, Delaware (Kervick Decl.) ⁋ 23; Ex. 13, Michigan (Nagel Decl.) ⁋ 38; Ex. 23, Wisconsin (Phelps Decl.) ⁋ 26.

Fifth, Defendants' actions are arbitrary and capricious because they failed to take into consideration the substantial reliance interests of Plaintiff States who have developed systems to monitor and comply with the longstanding conditions of these grants that did not restrict services by immigration status. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30 (internal quotations omitted). Defendants fail to offer any explanation accounting for how the States should move forward where they have relied on these programs applying to *all* crime victims or how the Plaintiff States are supposed to implement the Legal Services Condition. None of Plaintiff States required inquiry into an individual's immigration status. *See, e.g.*, Ex. 2, Arizona (Coleman Decl.) ⁋ 9; Ex. 5, Connecticut (Pelka Decl.) ⁋⁋ 12–13; Ex. 12, Massachusetts (Lowney Decl.) ⁋ 12; Ex. 14, Minnesota (Babine Decl.) ⁋⁋ 8–9; Ex. 17, New York (Williams Decl.) ⁋⁋ 12–14; Ex. 22, Washington (Guertin-Anderson Decl.) ⁋⁋ 15–16. Defendants also failed to

consider, let alone weigh, the substantial administrative costs associated with this change in policy, particularly in light of the brief six-week window Defendants gave to implement the change.

Sixth, the Legal Services Condition is arbitrary and capricious where it fails to explain how the Plaintiff States should interpret the multiple ambiguities that Plaintiff States would need to resolve to determine how to comply and monitor compliance. As described above, Plaintiff States are left to determine for themselves what falls within the Legal Services Condition, which groups are excluded from those services, and how state agencies (and subgrantees) are to transform their operations to identify which victims, witnesses, and other legal service recipients to exclude. Plaintiff States cannot discern whether the Legal Services Condition is intended only to prohibit Plaintiff States and subgrantees from requesting reimbursement for legal services to individuals whom they know to be undocumented immigrants or whether Defendants intend to impose an affirmative obligation on Plaintiff States and subgrantees to ascertain the immigration status of all recipients of funded services. Either would require a change in procedure, and the latter may conflict with state laws, as explained above. *See supra* 20.

Finally, the Legal Services Condition is arbitrary and capricious because it applies retroactively to previously awarded grants. *See supra* 18; *see also Bennett v. New Jersey*, 470 U.S. 632, 640 (1985) (applicable grants terms are based on "the law in effect when the grants were made," not retroactive changes in substantive requirements made after). Defendants have failed to provide any reasoned explanation for applying the Legal Services Condition retroactively.

### C. The Legal Services Condition Is Contrary to Law as Applied to VOCA's Victim Assistance Program and VAWA Programs.

Finally, the Legal Services Condition is contrary to law as it applies to VOCA's Victim Assistance program and VAWA. Under the APA, courts are "to set aside federal agency action that is 'not in accordance with law.'" *NextWave Pers. Commc'ns Inc.*, 537 U.S. at 300 (quoting 5 U.S.C.

§ 706(2)(A)). This "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering," *id.* (emphasis in original), including an agency's own regulations, *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir. 2020), *amended on reh'g*, 973 F.3d 143 (1st Cir. 2020).

The Legal Services Condition is contrary to law because it conflicts with several aspects of the VAWA statute. VAWA expressly provides that legal services funded under its auspices may include immigration-related services. 31 U.S.C. §§ 10441(b)(5), (b)(10), 12291(a)(46). Moreover, Congress expressly required that at least ten percent of victim services funded by VAWA STOP and SASP programs be directed to "underserved populations," that is, those "populations who face barriers in accessing and using victim services," including because of their "alienage status." *Id*. §§ 10441(b)(5), 10446(c)(4)(C).

Moreover, for both VAWA and VOCA Victim Assistance, the Legal Services Condition is contrary to law because it conflicts with governing regulations, which explicitly provide that "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status." 28 C.F.R. § 94.103(a) (VOCA); 28 CFR § 90.4(c) (VAWA). In direct conflict, the Legal Services Condition expressly provides the exact opposite: that victim eligibility for legal services is dependent on their immigration status.

Defendants have thus acted contrary to law, and the Court should set aside the Legal Services Condition as applied to VAWA and the VOCA Victim Assistance program.

## II.    Plaintiffs Face Irreparable Harm Absent Temporary Relief.

The Court should enter a preliminary injunction because Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons*

*of Warwick*, *Inc. v. Baccarat*, *Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22 (emphasis in original). Injuries of many types are irreparable, and district courts "have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quotation marks and citation omitted). Plaintiff States face irreparable injuries in the form of both proprietary injuries and harm to their sovereign interests. *See also New York v. DOJ*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *24 ("It is reasonable to infer that similar harms will flow from each Notice across each state, based on the extensive record already provided.")

*First*, Plaintiff States face proprietary injuries stemming from the substantial new costs and operational burdens to comply with the Legal Services Condition, particularly if Plaintiff States are required to affirmatively determine whether recipients of funded services are removable or unlawfully in the United States or are required to monitor compliance by subgrantees. *See California v. Trump*, No. 25-cv-10810, 2025 WL 1667949, at *16 (D. Mass. June 13, 2025) (identifying irreparable harm where an executive order "would impose new and complex duties on agencies across the States and would divert and require significant resources to train personnel in these agencies to assess citizenship where public assistance agencies do not have such expertise"); *New York v. DOJ*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *22; *City & Cnty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy, constitute irreparable harm). This change in program implementation would force Plaintiff States and their subgrantees to divert resources and incur "'unrecoverable

29

compliance costs in the absence of a preliminary injunction,' and the federal government's 'sovereign immunity typically makes' such losses irreparable." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 57 F. 4th 545, 556 (6th Cir. 2023)). Even if there were not sovereign immunity and recoupability issues, which there are, Defendants have not agreed to repay the increased costs, and the Supreme Court has held that such silence alone is sufficient for irreparable harm. *NIH v. Am. Pub. Health Assoc.*, 145 S. Ct. 2658, 2659 (2025) (irreparable harm whether other party "do[es] not state that they will repay").

The determination of who is "removable" or otherwise unlawfully present in the United States is far from straightforward. If the Legal Services Condition imposes an affirmative burden to verify immigration status, many organizations are unlikely to be able to implement verification programs at all and may simply cease funding or providing any legal services to crime victims, which will prevent services from being provided to all populations. Even in instances where the Legal Services Conditions may not be absolutely prohibitive, it will take time, training, and considerable resources to prepare Plaintiff States' program staff to perform verification of immigration status or monitor its subrecipients' compliance with this condition. Plaintiff States and subgrantees would need to entirely overhaul their systems and expend substantial additional administrative costs and significantly detract from the amount of and quality of services offered. Ex. 2, Arizona (Coleman Decl.) ¶¶ 17–21; Ex. 3, California (Hammett Decl.) ¶¶ 28–36; Ex. 5, Connecticut (Pelka Decl.) ¶¶ 30–32; Ex. 6, Delaware (Kervick Decl.) ¶¶ 22–24; Ex. 7, Illinois (Hadley Decl.) ¶ 23–25; Ex. 12, Massachusetts (Lowney Decl.) ¶¶ 24–30; Ex. 13, Michigan (Nagel Decl.) ¶¶ 37–39; Ex. 17, New York (Williams Decl.) ¶¶ 31–33; Ex. 22, Washington (Guertin-Anderson Decl.) ¶¶ 27–28.

*Second*, the Legal Services Condition will undermine the mission and efficacy of Plaintiff States' own crime victim programs, causing negative impacts on public safety that harm Plaintiff States' residents. Many of the programs affected by these notices serve the most vulnerable residents of Plaintiff States, people who may have experienced significant upheaval in their lives, or people who may have difficulty accessing legal services or advocating for themselves. Ex. 10, Maine (Johnson Decl.) ⁋ 11; Ex. 13, Michigan (Nagel Decl.) ⁋ 10; Ex. 15, New Jersey (Teffenhart Decl.) ⁋ 14; Ex. 19, Oregon (Keck Decl.) ⁋⁋ 6–7; Ex. 23, Wisconsin (Phelps Decl.) ⁋ 10. Even if Plaintiff States and subgrantees are able to verify immigration status, many of the most vulnerable victims will be unable to obtain services, including individuals who are not "removable" or "otherwise unlawfully present in the United States." Some victims may be unable to establish that they are lawfully present, particularly victims of domestic abuse who do not have access to identification or immigration paperwork. Ex. 19, Oregon (Keck Decl.) ⁋⁋ 6–7; Ex. 20, Rhode Island (Hogan Decl.) ⁋ 17; Ex. 23, Wisconsin (Phelps Decl.) ⁋ 24. And other victims will be reluctant to seek assistance for fear of facing immigrations consequences for themselves or their families. Ex. 3, California (Hammet Decl.) ⁋ 17; Ex. 22, Washington (Guertin-Anderson) ⁋ 18; Ex. 23, Wisconsin (Phelps Decl.) ⁋ 24.

Victim and witness participation is integral to the disposition of criminal cases and the functioning of the criminal justice system as a whole. The Legal Services Condition harms public safety and the criminal justice systems in Plaintiff States as it will foreseeably dissuade some victims and witnesses from coming forward in the first place. Ex. 3, California (Hammet Decl.) ⁋ 17; Ex. 5, Connecticut (Pelka Decl.) ⁋ 36; Ex. 13, Michigan (Nagel Decl.) ⁋ 11.

*Finally,* Plaintiffs face proprietary injuries because they face the threat of enforcement, which jeopardizes federal funding that Plaintiff States receive. The Legal Services Condition will

go into effect October 31, and the September 15 notice expressly states that it "will be subject to enforcement" starting October 31. The threat of losing funding if States do not change their practices is irreparable injury. *See California v. Trump*, 2025 WL 1667949, at *17. Ex. 2, Arizona (Coleman Decl.) ¶¶ 5–6; Ex. 3, California (Hammett Decl.) ¶¶ 7–9, 12; Ex. 4, Colorado (Lunn Decl.) ¶¶ 6–7, 12, 17, 29; Ex. 7-9, 12; Ex. 5, Connecticut (Pelka Decl.) ¶¶ 6–8; Ex. 6, Delaware (Kervick Decl.) ¶¶ 4–5; Ex. 7, Illinois (Hadley Decl.) ¶ 10; Ex. 8, Illinois (Hailey Decl.) ¶¶ 6–10, 21–28; Ex. 9, Maine (Gorneau Decl.) ¶ 7–8; Ex. 10, Maine (Johnson Decl.) ¶¶ 6–7; Ex. 11, Maryland (Lennig Decl.) ¶¶ 8–9, 14, 20; Ex. 12, Massachusetts (Lowney Decl.) ¶¶ 6–7; Ex. 13, Michigan (Nagel Decl.) ¶¶ 6, 9, 16–17, 26; Ex. 14, Minnesota (Babine Decl.) ¶¶ 2–4; Ex. 15, New Jersey (Teffenhart Decl.) ¶¶ 6–8; Ex. 16, New Mexico (Zubia Decl.) ¶¶ 11–15, 18; Ex. 17, New York (Williams Decl.) ¶¶ 6–8; Ex. 18, New York (Schaefer Decl.) ¶¶ 6–7, 13–14; Ex. 19, Oregon (Keck Decl.) ¶ 5; Ex. 20, Rhode Island (Hogan Decl.) ¶¶ 5–6; Ex. 21, Vermont (Poehlmann Decl.) ¶¶ 6–8, 10; Ex. 22, Washington (Guertin-Anderson Decl.) ¶ 10; Ex. 23, Wisconsin (Phelps Decl.) ¶¶ 6–7; Ex. 24, Massachusetts (Stanton Decl.) ¶¶ 6–7; Ex. 25, Oregon (Sivell Decl.) ¶¶ 6–7; Ex. 26, Nevada (Hoban Decl.) ¶¶ 6–7, 13–14.

## III.   The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.

The equities and the public interest tip sharply in favor of Plaintiff States. These factors "merge when the government is the opposing party." *Nken*, 556 U.S. at 435. "When weighing these factors, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief paying particular regard for the public consequences that would result from granting the emergency relief sought." *Rhode Island*, 781 F. Supp. 3d at 55 (quoting *Winter*, 555 U.S. at 24) (cleaned up).

While this litigation is pending, Plaintiff States seek to preserve the status quo as it existed for many years before the Legal Services Condition. Plaintiff States, subgrantees, and crime

victims have long relied on the availability of these funds, regardless of immigration status. None of these grants have been subject to a recipient limitation based on immigration status. The harms that will occur in the absence of an injunction, *supra* § II, show that granting emergency relief here is equitable and in the public interest.

Defendants may argue they will be injured by an injunction because it will limit their ability to implement the Trump Administration's priorities. But "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). While Defendants may act within their delegated authority, they must do so in ways that are legally compliant. *See, e.g., Rhode Island*, 781 F. Supp. 3d at 54–55 (rejecting argument "that granting the injunctive relief the States request would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities" (quoting record) (internal quotation marks omitted)); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1280 (W.D. Wash. 2025) (rejecting argument that "an injunction should not issue because the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's agenda" (quoting record) (internal quotation marks omitted)). Here, there is no public interest in Defendants' imposition of new and unlawful Legal Services Condition. The balance of the equities and the public interest tip decisively in favor of an injunction.[2]

---

[2] The Court should not require a bond under Fed. R. Civ. P. 65. "[T]here is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991); *see also P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020); *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (no bond); *Rhode Island*, 781 F. Supp. 3d at 55–56 (same). To the extent a bond

## <u>CONCLUSION AND RELIEF REQUESTED</u>

For the foregoing reasons, Plaintiffs States and their political subdivisions and instrumentalities respectfully request that the court grant the motion and enter a preliminary injunction and stay pursuant to 5 U.S.C. § 705 ordering that:

1. Defendants, their employees, and anyone acting in concert with them are preliminarily enjoined from enforcing or implementing in or against the Plaintiff States:

   a. Any aspect of the "Legal Services for Aliens" provision of the "DOJ Grants Financial Guide," currently available at https://www.ojp.gov/funding/financialguidedoj/iii-postaward-requirements#m9xapd, including as incorporated into any future DOJ Grants Financial Guide.

   For avoidance of doubt, the "Legal Services for Aliens" provision currently recites:

   > Except as indicated in the following sentence, costs of providing legal services (that is, professional services of the kind lawfully provided only by individuals licensed to practice law) to any removable alien (*see* 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States are disallowed and may not be charged against the award.

   > Costs for legal services disallowed under the preceding sentence do not include costs for legal services— (1) to obtain protection orders for victims of crime (including associated or related orders (e.g., custody orders), arising from the victimization); (2) that are associated with or relate to actions under 18 U.S.C. ch. 77 (peonage, slavery, and trafficking in persons); (3) to obtain T-visas, U-visas, or "continued presence" immigration status (*see, e.g.*, 8 U.S.C. § 1101(a)(15)(T) & (U); 22 U.S.C. § 7105(c)(3)(A)); or (4) as to which such disallowance would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

---

is required, Plaintiffs request that the bond be nominal, consistent with the practice in this Circuit. *See Maine v. United States Dep't of Agriculture*, 778 F. Supp. 3d 200, 236–38 (D. Me. 2025) (collecting cases).

b. The notices sent to Plaintiff States dated August 18, 2025 and September 15, 2025 regarding unallowable costs for legal services for aliens.

2. The effective date of the actions referenced in paragraph 1 are stayed pending conclusion of these proceedings with respect to Plaintiff States and their political subdivisions and instrumentalities. *See* 5 U.S.C. § 705.

3. The Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.

4. Defendants shall provide notice of this Order within 72 hours of entry to all Defendants, their employees, and anyone acting in concert with them. Defendants shall file a copy of the notice on the docket within 72 hours of its dissemination.

5. The Order shall become effective immediately upon entry by this Court.

6. Any other relief that this Court believes appropriate.


Dated: October 1, 2025                        Respectfully submitted,

**LETITIA JAMES**                             **PHILIP J. WEISER**
Attorney General for the State of New York    Attorney General for the State of Colorado

By: */s/ Natasha M. Korgaonkar*               By: */s/ David Moskowitz*
Rabia Muqaddam*                               David Moskowitz*
*Chief Counsel for Federal Initiatives*       *Deputy Solicitor General*
Natasha M. Korgaonkar*                        Nora Passamaneck*
*Special Counsel*                             *Senior Assistant Attorney General*
Zoe Levine*                                   Finnuala K. Tessier*
*Special Counsel*                             *Assistant Attorney General*
Benjamin Liebowitz*                           Colorado Department of Law
*Assistant Attorney General*                  1300 Broadway, #10
28 Liberty St. New York, NY 10005             Denver, CO 80203
212-416-6557                                  (720) 508-6000
Natasha.Korgaonkar@ag.ny.gov                  david.moskowitz@coag.gov

*Attorneys for the State of New York*         *Attorneys for the State of Colorado*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Michael M. Tresnowski*
Michael M. Tresnowski
*Assistant Attorney General*
Alex Hemmer
*Deputy Solicitor General*
Christopher G. Wells
*Chief of the Public Interest Division*
R. Henry Weaver
*Assistant Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 758-4496
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*


**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Joshua G. Nomkin*
Joshua G. Nomkin*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov

*Counsel for the State of Arizona*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Patrick J. Dolan*
Patrick J. Dolan (RI No. 10462)
*Senior Counsel to the Attorney General*
Paul T.J. Meosky (RI No. 10742)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
PDolan@riag.ri.gov
PMeosky@riag.ri.gov

*Attorneys for the State of Rhode Island*


**ROB BONTA**
Attorney General for the State of California

Michael L. Newman*
*Senior Assistant Attorney General*
Joel Marrero*
*Supervising Deputy Attorney General*
Jesse Basbaum*
Brian Bilford*
Luke Freedman*
Lee I. Sherman*
*Deputy Attorneys General*

By: */s/ Christopher P. Tenorio*
Christopher P. Tenorio*
*Deputy Attorney General*
California Department of Justice
600 W. Broadway, Suite 1800
San Diego, CA 92101 (619) 738-9000
Christopher.Tenorio@doj.ca.gov

*Attorneys for the State of California*

36

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Mitchell P. Reich*
Mitchell P. Reich *
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorney for the District of Columbia*


**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Attorneys for the State of Delaware*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson**
Virginia A. Williamson
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Ashley Meskill*
Ashley Meskill*
*Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorney for the State of Connecticut*


**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Stanley Abraham*
Stanley Abraham*
*Assistant Attorney General*
Office of the Attorney General
 6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Stanley.Abraham@maine.gov

*Attorney for the State of Maine*


**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By:  */s/ Michelle R. Pascucci*
Katherine B. Dirks
*Chief State Trial Counsel*
Michelle Rita Pascucci
*State Trial Counsel*
1 Ashburton Place

VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*

Boston, Massachusetts 02108
(617) 963-2255
Katherine.Dirks@mass.gov
Michelle.Pascucci@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
John Pallas*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PallasJ@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorney for the State of Minnesota*

**AARON D. FORD**
Attorney General for the State of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: */s/ Meghan Musso*
Meghan Musso*
Amanda McElfresh*
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5276
meghan.musso@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Mark Noferi*
Mark Noferi*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*

*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorney for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Benjamin Seel*
Benjamin Seel*
*Assistant Attorney General*
Marsha Chien*
Cristina Sepe*
*Deputy Solicitors General*
Washington State Office
of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Colin T. Roth*
Colin T. Roth*
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
colin.roth@wisdoj.gov

*Attorney for the State of Wisconsin*

*Pro hac vice application forthcoming

## INDEX OF EXHIBITS

| Exhibit | State | Description |
|---|---|---|
| 1 | | Excerpt of DOJ Grants Financial Guide |
| 2 | AZ | Declaration of Deston Coleman, Jr. of the Arizona Department of Public Safety |
| 3 | CA | Declaration of Ulrice (Ricki) Hammett of the California Governor's Office of Emergency Services |
| 4 | CO | Declaration of Matthew Lunn of the Colorado Division of Criminal Justice |
| 5 | CT | Declaration of Marc Pelka of the Connecticut Office of Victim Services. |
| 6 | DE | Declaration of Christian Kervick of Delaware's Criminal Justice Counsel |
| 7 | IL | Declaration of Samuel Hadley of the Illinois Criminal Justic Information Authority |
| 8 | IL | Declaration of Shataun Hailey of the Illinois Criminal Justice Information Authority |
| 9 | ME | Declaration of Derek Gorneau of the Maine Department of Public Safety |
| 10 | ME | Declaration of Bobbie L. Johnson of the Maine Department of Health and Human Resources |
| 11 | MD | Declaration of Dorothy Lennig of the Maryland Governor's Office of Crime Prevention and Policy |
| 12 | MA | Declaration of William T. Lowney of the Massachusetts office for Victim's Assistance |
| 13 | MI | Declaration of Beth Nagel of the Michigan Department of Health and Human Services |
| 14 | MN | Declaration of Kim Babine of the Minnesota Department of Public Safety |
| 15 | NJ | Declaration of Patricia Teffenhart of the New Jersey Department of Law and Public Safety |
| 16 | NM | Declaration of Francisco Zubia of the New Mexico Crime Victims Reparation Commission |
| 17 | NY | Declaration of Melinda Williams of the New York Office of Victim Services |
| 18 | NY | Declaration of William M. Schaefer, Jr. of the New York State Division of Criminal Justice Services |
| 19 | OR | Declaration of Ryan Keck of the Oregon Criminal Justice Commission |
| 20 | RI | Declaration of Michael J. Hogan of the Rhode Island Public Safety Grant Administration Office |
| 21 | VT | Declaration of Jeffifer Poehlmann of the Vermont Center for Crime Victim Services |
| 22 | WA | Declaration of Cindy Guertin-Anderson of the Washington State Department of Commerce |
| 23 | WI | Declaration of Shira Phelps of the Wisconsin Department of Justice |

| 24 | MA | Declaration of Kevin Stanton of the Massachusetts Office of Grants and Research |
|----|----|---------------------------------------------------------------------------------|
| 25 | OR | Declaration of Shannon Sivell of the Oregon Department of Justice |
| 26 | NV | Declaration of Jessica Hoban, Nevada's Chief Financial Officer |