# EXHIBIT #7

# **DECLARATION OF SAMUEL HADLEY**

I, Samuel Hadley, pursuant to 28 U.S.C. § 1746, hereby declare:

1.     I am over the age of eighteen and understand the obligations of an oath.

2.     I am the Justice Assistance Grant Program Manager of the Federal and State Grants Unit at the Illinois Criminal Justice Information Authority (ICJIA), located in Illinois, and I have held this role since 2024. I make this declaration based on personal knowledge.

3.     ICJIA is an Illinois executive-branch state agency. ICJIA brings together key leaders from the justice system and the public to identify critical issues facing the criminal justice system in Illinois and to propose and evaluate policies, programs, and legislation that address those issues. The agency also works to ensure the criminal justice system in Illinois is efficient and effective.

*Edward Byrne Memorial Justice Assistance Grant Program Funds*

4.     I am familiar with the Edward Byrne Memorial Justice Assistance Grant ("JAG") program. The purpose of the JAG program is to provide federal criminal justice funding from the U.S. Department of Justice ("DOJ") to states and units of local government to assist their efforts to prevent and reduce crime and violence. DOJ awards JAG funds to recipients for each fiscal year based on a statutory funding formula. JAG funds are typically used by grant recipients to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice and law enforcement programs.

5.     In addition to using JAG funds themselves, grant recipients may pass JAG funds through to subgrantees for the same purposes. For example, the state may pass JAG funds through to county or local law enforcement agencies.

6.     JAG funding is administered in Illinois by ICJIA, which serves as the State Administering Agency for Illinois.

1

7. Illinois has applied for and received funds from JAG and its predecessor program, the Edward Byrne Memorial State and Local Law Enforcement Assistance Program, since 1988.

8. The term of JAG awards is typically four years, meaning that the award remains open for a four-year period, subject to extension at the discretion of DOJ. Any program activities supported by the awarded funds must be completed within the time the award remains open. After the award closes, any remaining unpaid obligations from such program activities must be paid within 120 days of the close date.

9. Illinois' JAG awards from FY2022-24 time period remain open.

***Legal Assistance under Byrne JAG***

10. Illinois allocates JAG funding according to the goals outlined in ICJIA's 2024-2029 strategic plan. The creation of the strategic plan was lengthy and resource intensive. The ICJIA Ad Hoc Committee, a temporary committee consisting of ICJIA board members and criminal justice experts, began the process of developing a strategic plan by holding listening sessions. Over the course of three one-and-a-half hour listening sessions, members of the ICJIA Ad Hoc Committee heard from 22 criminal justice and social science practitioners regarding the top criminal justice areas in need of funding and resources. Next, ICJIA conducted an online survey to collect input from stakeholders at agencies and sectors not represented in the listening sessions. After these initial listening sessions and the survey, ICJIA identified a set of major themes for consideration for the use of future JAG funds. ICJIA staff then analyzed crime and justice system data to explore whether there was quantitative support for conclusions drawn from the listening sessions and survey. All of this information went to the ICJIA Federal and State Grants Unit, which examined other grant resources and JAG requirements. Finally, ICJIA staff turned the themes developed from these various sources into a set of priorities that would guide JAG funding and the

ICJIA research agenda for 2024-2029. The priorities identified in the 2024-2029 plan include (1) addressing mental health and substance use disorders for justice-involved persons; (2) reducing violent crime and firearm violence in Illinois communities; (3) supporting and protecting victims and witnesses of crime; (4) supporting the state in criminal justice planning, data analysis, evaluation, and identification of evidence-based and informed practices; (5) updating and improving technology and infrastructures for better data capture and integration; (6) supporting public defense services; and (7) supporting housing needs for justice-involved persons.[1]

11. Regarding public defense services, the Statewide plan explains that "Stakeholders recognized the need to provide balanced resources to the components of the criminal justice system for it to work efficiently. This was particularly true for public defense, where a lack of staff and training resources can hinder the entire process." Because of "limited availability of staff and judges" and "climbing caseloads," some indigent defendants faced long waits to speak with counsel.

12. In 2025, ICJIA posted a notice of funding opportunity making $850,000 available from the FY2022 JAG award for public defense services. That notice explained that "Stakeholders were concerned about insufficient labor pools in rural areas to satisfy the future demand for public defense. Excessive caseloads caused by inadequate staffing create scenarios where public defenders cannot adequately perform their responsibilities."

13. ICJIA awarded seven Byrne JAG Public Defender grants on August 21, 2025, with the award period on these subgrants set to begin on October 1, 2025. Recipients in the Coles

---

[1] ICJIA published a report regarding its 2024-2029 strategic plan. The report describes in detail both the process it used to develop its plan and the nature of the seven priorities identified in the plan. The report is available online at https://researchhub.icjia-api.cloud/uploads/JAG%202024-29%20FINAL%20DRAFT%208-2024-240808T19411840.pdf.

3

County and Kankakee County public defender's office intend to spend the Byrne JAG funds on attorneys who will provide direct public defense services.

14. ICJIA and our subgrantees do not screen individuals for immigration status as an eligibility factor for services funded by Byrne JAG. If ICJIA and our subgrantees were required to perform such screening, the provision of services funding Byrne JAG would become inefficient, frustrating the goals of the Byrne JAG program.

### *The unallowable cost notice and legal services restriction*

15. On August 18, 2025, ICJIA received emails from the Office of Justice Programs entitled "Notice Regarding Unallowable Costs" for each of our open Byrne JAG grants (*i.e.*, for each of FYs 2022, 2023, and 2024). Apart from the number identifying the relevant open grant year, the emails were identical. They contained the following language:

> Effective immediately upon receipt of this notice, any obligations of funds, at any tier, under this award to provide (or to support the provision of) legal services to any removable alien or any alien otherwise unlawfully present in the United States shall be unallowable costs for purposes of this award, but the foregoing shall not be understood to apply—(1) to legal services to obtain protection orders for victims of crime; or (2) to immigration-related legal services that may be expressly authorized or required by any law, or any judicial ruling, governing or applicable to the award.

16. This emailed notice and the new unallowable cost that it describes came to ICJIA as a surprise. We had no prior notice that DOJ planned to restrict the provision of legal services under Byrne JAG in this way, whether from BJP, DOJ, or any other party.

17. On September 15, 2025, the Office of Justice Programs sent another communication to ICJIA entitled "NOTICE REGARDING UNALLOWABLE COSTS UNDER THE AWARD (re: legal services to certain aliens)," stating:

> The notice entitled "Notice Regarding Unallowable Costs Under the Award" that was sent on August 18, 2025 (which this notice supersedes), will be implemented as specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs"

("Legal Services for Aliens"). As provided in the award itself, compliance with the DOJ Grants Financial Guide is a material requirement of the award. The award requirement specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs" ("Legal Services for Aliens") will be effective – and will be subject to enforcement under this Federal grant award from the Department of Justice – starting on October 31, 2025.

18. Although the "DOJ Grants Financial Guide" currently available online states that it was "Last Updated October 2024," it appears that the referenced provision in Chapter 3.13 was added in September of this year. In relevant part, it states that while "costs of providing legal services (that is, professional services of the kind lawfully provided only by individuals licensed to practice law) to any removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States are disallowed and may not be charged against the award," it exempts the following categories of legal services from the prohibition:

- Orders of protection, "including associated or related orders (e.g., custody orders), arising from the victimization;"
- Services associated with 18 U.S.C. ch. 77, relating to "peonage, slavery, and trafficking in persons;"
- Services to obtain T-visas, U-visas, or "'continued presence' immigration status (see, e.g., 8 U.S.C. § 1101(a)(15)(T) & (U); 22 U.S.C. § 7105(c)(3)(A); and,
- Services for which "disallowance would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award." *Id.*

19. ICJIA perceives a number of major problems with the new unallowable costs— even as augmented by the Office of Justice Program's September 15, 2025 communication. To begin with, this new restriction was not in any of the original grant awards, and represents a significant change in how the program has been operated. We did not know, nor could we have known, that DOJ would impose this new unallowable cost on awards years later, while we are still spending down those funds.

5

### *The impact of the legal services restriction*

20. Even if DOJ only plans to enforce this new legal services restriction going forward, imposing this new restriction after our acceptance of the awards presents challenges for ICJIA. We relied on the various terms and conditions for each grant year, as they were represented to us when the grant awards were made.

21. Because there was no restriction on the kinds of services that could be provided to certain groups (whether based on immigration status, or anything else) in the fiscal years for which we have open Byrne JAG grants, ICJIA did not consider when making past subgrantee awards that certain types of services (in this case, certain legal services) would later be disallowed for certain types of legal service recipients (in this case, "any removable alien or any alien otherwise unlawfully present in the United States").

22. Further, based on my experience, it would be extremely difficult for our subgrantees to implement a system to verify immigration status and exclude some recipients from some services. Immigration status is legally complex, and it would require extensive new expertise and training for staff members to learn how to verify various immigration statuses. It is hard to determine how ICJIA could expect our subgrantees, most of whom are resource-limited organizations, to develop entirely new expertise and practices for determining which recipients are "removeable" or "otherwise unlawfully present." These challenges are particularly acute when the FY2022 Byrne JAG awards for public defender's offices have just recently been awarded.

23. At ICJIA, our work would similarly need a significant overhaul—and additional resources—to be able to monitor subgrantees' compliance with the new condition. To our knowledge, ICJIA has neither needed to make a determination as to which legal service recipients are "removable alien[s] or ... alien[s] otherwise unlawfully present in the United States," nor

needed to require our subgrantees to do so. It is hard to know exactly how ICJIA would transform our own operations and practices to be able to ensure subgrantee compliance with the new legal services restriction.

24. At the outset, ICJIA would need to create our own immigration-related expertise and then modify current training and monitoring protocols to accommodate the new legal services restriction. While ICJIA possesses expertise in grant administration, our job has never involved determination of immigration status, and ICJIA does not possess expertise in this area. Not only will ICJIA have to develop and deliver new trainings related to making determinations on immigration status, but we will also need to train subgrantees on their compliance with the restriction. Preparation and delivery of these new trainings alone would take material time and expense from ICJIA. Monitoring subgrantee compliance would also require significant ongoing resources. Operationalizing the legal services restriction, which would entail creating new trainings, changing protocols for us and our subgrantees, and standing up a new statewide monitoring apparatus, will require considerable time and expenses.

25. As should be clear, complying with this new restriction would not be a mere tweak to existing operations—it would be a true overhaul and transformation of what our work is and how we do that work. The same would likely be true for our subgrantee organizations. This overhaul would create funding delays, including for awards that subgrantees intend to imminently start spending down. In spite of how big of a change this would be for our Byrne JAG program, ICJIA has to this day not received (and is not aware of) any guidance from DOJ, OJP, or BJP about what State grantees must do to develop an internal system to conduct immigration status screenings, to train subgrantees on the same, or to monitor subgrantees' compliance. Considering that we have received only two communications from OJP on this restriction, it is not clear that

they understand or have considered how much our work and operations, and those of our subgrantees, would have to change in order to comply with the restriction.

26.  Further, although the condition allows Illinois and its subgrantees to continue providing legal services exempted in the "DOJ Grants Financial Guide" and legal services where "disallowance would contravene any express requirement of any law," it is not clear which legal services this exemption covers. No guidance has been provided on what constitutes an "express requirement of any law." Illinois is left to guess at what constitutes an "express requirement" and whether the exception applies to regulatory as well as statutory provisions and state as well as federal laws.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of September 2025 in Chicago, Illinois

_____
Samuel Hadley
Public Service Administrator Opt1
JAG Program Manger
Illinois Criminal Justice Information
Authority (ICJIA)