# EXHIBIT #20

## DECLARATION OF MICHAEL J. HOGAN

I, Michael J. Hogan, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I make this affidavit based on personal knowledge. I am the Executive Director of the Rhode Island Public Safety Grant Administration Office (PSGAO) within the Department of Public Safety located in Rhode Island, and I have held this role since 2017.

***Victims of Crime Act – Victim Assistance Program***

3. I am familiar with the Victims of Crime Act ("VOCA"), and, specifically, with VOCA's Victim Assistance program. The purpose of VOCA is to provide resources and assistance, including certain direct services, to victims and witnesses of crime, and their families. The resources and assistance provided to these individuals in the wake of a crime is critical to their healing, their safety, and public safety generally.

4. The Victim Assistance program is a "formula grant" program under VOCA. Under this program, States receive funding from the U.S. Department of Justice (through its Office for Victims of Crime, or OVC, which is a program office within the Office of Justice Programs, or OJP). The amount of funding allocated to each state is calculated from a formula in the VOCA statute. The formula is based on a state's population and crime rates.

5. For VOCA formula grants, including the Victim Assistance program grant, the "award period" is the year that the grant was received for, plus the three years after that. An "award period" is the time period during which the awarded monies can be spent down by a grantee state and its subgrantees. For example, for a VOCA Victim Assistance award that a State received for

1

FY 2020, that State (and its subgrantees) may draw from that award through the end of FY 2023. If the award is not fully spent by the end of the award period, the grantee State can seek an extension from OVC to be able to continue to draw from that award. The federal fiscal year concludes at the end of September. As of this date, Rhode Island and its subgrantees have a total of $1,902,654.78 left to draw down for the following open awards:

- o The $5,096,442.00 award for FY2022;
- o The $4,795,700.00 award for FY2023;
- o The $2,935,210.00 award for FY2024.

6.  For FY2025, Rhode Island was awarded $4,516,901.00 for the Victim Assistance program grant.

7.    Victim Assistance funds are critical for Rhode Island. Through our subgrantees, Victim Assistance program funding is used for a broad range of services, including criminal justice advocacy for the deaf community, support for human trafficking victims, support for domestic violence victims, advocacy and support for child sexual assault investigations, a domestic violence and sexual assault victim hotline, court advocates to accompany victims through the criminal justice process, clinics for uninsured victims as well as those seeking to preserve their anonymity, legal services for the elderly, shelters for domestic violence victims and their families, support for community-based advocacy groups, and the Victim Advocate Academy, which trains advocates to follow up with victims, accompany victims to court, refer victims to services, and walk victims through the victim compensation process.  The State has also used VOCA Assistance Program funds to establish a multiagency platform to provide victims and their advocates information on offender compliance and release as well as to allow victims to submit impact statements for parole hearings.  In FY 2024, a total of 41,015 individuals received services through VOCA Assistance

2

Program funds in Rhode Island.  Each person served was a victim or witness, or family member. The services provided to these individuals are important to their safety and healing after a crime.

8.    PSGAO and our subgrantees do not screen individuals for immigration status as an eligibility factor for VOCA services. This is in accordance with VOCA regulations, which state that "[v]ictim eligibility under this program for direct services is not dependent on the victim's immigration status." 28 C.F.R. §§ 94.103(a), 94.116. Consistent with these regulations, PSGAO and our subgrantees do not turn away any victims seeking VOCA allowable assistance based on their immigration status. The accessibility of these services to all victims, witnesses, and families is essential given that VOCA funds support some of the most vulnerable members of our communities, and people who may have experienced significant upheaval in their lives. The programming and services that these funds support also help us to build trust with victims and witnesses, whose participation (irrespective of their immigration status) is important to the advancement of public safety interests.

9.    Similarly, other subgrantees would not inquire about an individual's immigration status to determine whether that person is eligible for VOCA-funded services, because the regulations make clear that immigration status is not an eligibility requirement for VOCA-funded and subgrantee-provided direct services. 28 C.F.R. § 94.116.

10.    Victims and witnesses come to our subgrantees seeking assistance after they have been victimized, and it is critical that we use this opportunity to build trust with them. In my experience, when victims or witnesses are afraid that reporting a crime (or seeking related services/support) could result in adverse immigration consequences for them or their families, it is both harmful for them personally and a detriment to public safety broadly. Victims and witnesses

3

must be able to come forward and access services. Their participation can be integral to the disposition of a criminal action and to the functioning of the criminal justice system itself.

***Legal assistance under VOCA Victim Assistance***

11.    Some of our subgrantees provide certain direct civil legal assistance to victims in the wake of a crime. Under VOCA, these services must be directly related to their victimization, and can include assistance in seeking an order of protection, representation in family court to gain emergency custody of children right after a domestic violence incident, or representation in housing court. 28 C.F.R. §§ 94.119(a)(10), (f).

12.    Each of the direct services allowable under VOCA Victim Assistance program is critical to victim restoration, well-being, and safety. Civil legal assistance is particularly important for victims, witnesses, and their families because their safety is critical to upholding confidence in the legal system and securing cooperation with criminal investigations and prosecutions.

***The unallowable cost notice and legal services restriction***

13.    On August 18, 2025, PSGAO received emails from the Office of Justice Programs entitled "Notice Regarding Unallowable Costs," including one such email for each of our open VOCA Victim Assistance grants (*i.e.*, for each of FY2022, FY2023, and FY2024). Apart from the number identifying which open grant year the notice was related to, the emails were identical. They contained the following language:

> Effective immediately upon receipt of this notice, any obligations of funds, at any tier, under this award to provide (or to support the provision of) legal services to any removable alien or any alien otherwise unlawfully present in the United States shall be unallowable costs for purposes of this award, but the foregoing shall not be understood to apply—(1) to legal services to obtain protection orders for victims of crime; or (2) to immigration-related legal services that may be expressly authorized or required by any law, or any judicial ruling, governing or applicable to the award.

4

14.     This emailed notice and the new unallowable cost that it describes came to PSGAO as a surprise. We had no prior notice that DOJ planned to restrict the provision of legal services under VOCA in this way, whether from OVC, OJP, DOJ, or any other party.

15.     PSGAO perceives a number of major problems with the new unallowable costs. To begin with, this new restriction was not in any of the original grant awards, and it represents a significant change in how the program has been operated. We did not know, nor could we have known, that DOJ would impose this new unallowable cost on awards years later, while we are still spending down those funds.

***The impact of the legal services restriction***

16.     Even if DOJ only plans to enforce this new legal services restriction going forward, imposing this new restriction after our acceptance of the awards presents challenges for PSGAO. We relied on the various terms and conditions for each grant year, as they were represented to us when the grant awards were made. Generally, when PSGAO makes subgrantee determinations in the year of each award grant, we do so based on a number of factors, including the type and volume of services that each subgrantee-applicant provides. Because there was no restriction on the kinds of services that could be provided to certain groups of victims and witnesses (whether based on immigration, or anything else) in the fiscal years for which we have open VOCA Victim Assistance grants, PSGAO did not consider when making past subgrantee awards that certain types of services (in this case, legal services) would later be disallowed for certain types of victims and witnesses (in this case, "any removable alien or any alien otherwise unlawfully present in the United States").

17.     Further, based on my experience, it would be extremely difficult for our subgrantees to implement a system to verify immigration status and exclude some victims from some services. Immigration status is legally complex, and it would require extensive new expertise and training

5

for staff members to learn how to verify various immigration statuses. It is hard to determine how PSGAO could expect our subgrantees, most of whom are resource-limited, non-profit, and community-based organizations, to develop entirely new expertise and practices for determining which victims are "removeable" or "otherwise unlawfully present." It is also important to consider that people who have experienced crime, and survivors of domestic violence, in particular, may not have access to the legal documents required to prove that they have lawful status. In fact, we know from our work with survivors that cutting off victims' access to important legal documents is a common coercive and abusive tactic. Excluding all individuals who cannot prove their immigration status would punish not only undocumented survivors, but it would also punish victims who simply do not have access to the requisite documentation.

18.    At PSGAO, our work would similarly need a significant overhaul—and additional resources—to be able to monitor subgrantees' compliance with this new condition. To our knowledge, PSGAO has neither needed to make a determination as to which victims or witnesses are "removable alien[s] or … alien[s] otherwise unlawfully present in the United States," nor needed to require our subgrantees to do so. Consistent with the VOCA statute and regulations, eligibility for these services has not been dependent on a person's immigration status. It is hard to know exactly how PSGAO would transform our own operations and practices to be able to ensure subgrantee compliance with the new legal services restriction.

19.    At the outset, PSGAO would need to create our own immigration-related expertise, and then modify current training and monitoring protocols to accommodate the new legal services restriction. While PSGAO possesses expertise in grant administration, our job has never involved determination of immigration status, and PSGAO does not possess experts in this area. Not only will PSGAO have to develop and deliver new trainings related to making determinations on

6

immigration status, but we will also need to train subgrantees on their compliance with the restriction. Preparation and delivery of these new trainings alone would take material time and expense from PSGAO. Monitoring subgrantee compliance would also require significant ongoing resources. Operationalizing the legal services restriction, which would entail creating new trainings, changing protocols for us and our subgrantees, and standing up a new statewide monitoring apparatus, will require considerable time and expenses that would otherwise go toward the victims of crime whom we serve.

20.    As should be clear, complying with this new restriction would not be a mere tweak to existing operations—it would be a true overhaul and transformation of what our work is and how we do that work. The same would likely be true for our subgrantee organizations. In spite of how big of a change this would be for our VOCA Victim Assistance program, PSGAO has to this day not received (and is not aware of) any guidance from DOJ, OJP, or OVC about what State grantees must do to develop an internal system to conduct immigration screenings, to train subgrantees on the same, or to monitor subgrantees' compliance. Considering that we have received only one email from OJP on this restriction, it is not clear that they understand or have considered how much our work and operations, and those of our subgrantees, would have to change in order to comply with the restriction.

21.    Further, although the condition allows Rhode Island and its subgrantees to continue providing assistance to victims seeking protective orders and legal services "required by law," it is not clear exactly which legal services this exception covers. As described above, existing VOCA regulations contemplate numerous other forms of legal assistance, beyond seeking protective orders, as allowable costs. For example, while it would have been clear to us before the legal services restriction that allowable legal assistance would entail, for example, representation of a

7

victim seeking an amended custody order in family court, it is now not clear whether this kind of legal assistance would now be unallowable. Also, when a victim advocate assists a victim in filling out required papers to request compensation under VOCA's Victim Compensation program, this could be deemed a "legal service" in that the forms have legal effect; but victim advocates typically are not attorneys, paralegals, or legal workers. Our subgrantees may also provide support in housing court or in labor disputes as issues related to their victimization. Likewise, our subgrantee organizations may provide language translation services or send case managers to accompany victims through the legal process, services that may be considered in "support of the provision of" legal services under the Unallowable Conditions restriction. The language in the restriction is therefore both ambiguous and unworkable in practice.

22.    Even if PSGAO had the resources to undertake this transformation without diverting funds from work supporting our mission, and even if it were clear what "legal services" the restriction pertains to, adapting our and our subgrantees' ways of working to comply with the restriction would still fundamentally change how we and our subgrantees do this work. Our mission is to facilitate inter-agency cooperation and collaboration throughout the Rhode Island criminal justice system by way of strategic planning, program coordination, data collection and statistical analysis; while providing fair, efficient and accountable grant administration so as to improve the state's overall response to crime and victimization and enhance public safety. The services that we fund, using VOCA grants, help us to build trust with victims and witnesses by providing them with the support and assistance that they need, when they need it. If we were to start to withhold certain services from certain victims, this could do irreparable damage to the trust that PSGAO has spent many years building with those victims' communities. For years, our message to *all* victims and witnesses, consistent with the VOCA statute and regulations, has been

8

that we are available to support *everyone* who is a victim or witness of crime. If that stops being true, our work will need to change, and we may no longer be as effective at fulfilling our mission as we are now.

23.     Finally, the victims, families, and witnesses who come to us and our subgrantees to seek assistance are often going through the worst, most difficult periods of their lives. They have generally experienced serious trauma, and many have been subject to or exposed to physical violence. The entire VOCA program, including Victim Assistance, is designed to build trust with these individuals in spite of the terrible events that have rendered them eligible for the resources, programs, and services funded by VOCA. The legal services restriction will have real impact on their lives. One example is that a crime victim could come to a subgrantee organization seeking representation in family court to gain sole custody to protect a child from an abusive and dangerous partner. Before we received the new unallowable cost notice, it would have been clear to PSGAO and to our subgrantees that that victim is to be represented in family court, and that the costs associated with that representation are contemplated by and allowable under VOCA. The new condition, in contrast, would have our subgrantees first interrogate the immigration status of that victim, and potentially that of the child, as a requisite step before even agreeing to provide them with assistance.

24.     This scenario would not only seem to counter to the requirements of VOCA as we understand them through the statute and regulations, but would also be at odds with the ethos of this work. I know, based on my professional expertise through 8 years of experience in the victim advocacy space, that asking victims questions that make them fearful, particularly as a threshold question before agreeing to assist them, is harmful to those individuals *and* to their trust in our

9

criminal system. It is detrimental to public safety, as this will foreseeably dissuade some victims and witnesses from coming forward—whether to law enforcement or to us—in the first place.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of September, 2025, in Scituate, Rhode Island.

_Michael J. Hogan_

Michael J. Hogan
Executive Director
PSGAO

10